708 So.2d 362 (1998)
June REED
v.
WAL-MART STORES, INC. and ABC Insurance Company.
No. 97-C-1174.
Supreme Court of Louisiana.
March 4, 1998.
*363 James D. Kirk, Alexandria, John G. Swift, Lafayette, for Applicant.
Brian M. Caubarreaux, Marksville, Anthony F. Salario, Baton Rouge, for Respondent.
TRAYLOR, Justice.[*]
We granted writs in this case to resolve a disparity among the Courts of Appeal regarding the standard for reviewing findings of an unreasonable risk of harm and to correct a decision which conflicts with this Court's recent decision in Boyle v. Board of Supervisors, Louisiana State Univ., 96-1158 (La.1/14/97); 685 So.2d 1080.
Because we find that the proper standard of appellate review is the manifest error standard and because we further find that no reasonable finder of fact could conclude that the defect at issue presented an unreasonable risk of harm and because the lower courts' finding of such conflicted with Boyle, we find that the lower courts were manifestly erroneous and reverse.

FACTS AND PROCEDURAL HISTORY
On February 3, 1995, June Reed fell in a Wal-Mart parking lot, breaking her arm. The parking lot is constructed of fifteen-foot concrete squares. She alleges that she tripped on an uneven expansion joint between two of the squares.
At trial, Reed asserted that the expansion joint was defective and that it presented an unreasonable risk of harm. The plaintiff's safety expert testified that there were vertical height differences of ¼ to ½ inch along the joint at issue. The expert testified that, while a ¼ inch variance is acceptable, a ½ inch variance is unreasonably dangerous. The trial court, applying La. R.S. 9:2800.6, agreed with the plaintiff's expert and awarded plaintiff $50,000.
Finding that the trial court was not manifestly erroneous, the court of appeal affirmed.

DISCUSSION
The trial court held defendant Wal-Mart liable under La. R.S. 9:2800.6. The court found, along with the other required elements of La. R.S. 9:2800.6, that the "condition presented an unreasonable risk of harm."
It is common for the surfaces of streets, sidewalks, and parking lots to be irregular. It is not the duty of the party having garde of the same to eliminate all variations in elevations existing along the countless cracks, seams, joints, and curbs. These surfaces are not required to be smooth and lacking in deviations, and indeed, such a requirement would be impossible to meet. Rather, a party may only be held liable for those defects which present an unreasonable risk of harm. The issue in this case is the proper standard of reviewing, and what is encompassed within, a finding that a defect presents an unreasonable risk of harm.

Boyle v. Board of Supervisors, LSU

Because of its extreme similarity, we are initially guided by this Court's recent decision in Boyle, 685 So.2d at 1080, and a brief discussion of that case is warranted.
In Boyle, the lower courts had found that a ½ to 1 inch height variance in a sidewalk joint on the LSU campus was an unreasonably dangerous defect. The lower courts, *364 however, failed to apply a risk-utility analysis in arriving at that conclusion. Pretermitting the issue of the proper standard of review, this Court, after applying a risk-utility analysis, found manifest error and reversed. In doing so, the Court weighed the risk of the "relatively small depression" in the sidewalk joint against the sidewalk's social utility, including the cost of repair. Along with the size of the defect, the Court also considered as a factor the accident history of the alleged defect. The depression was located in a high traffic area and the plaintiff's fall was the first reported. After pointing out the clear usefulness of sidewalks, the Court then found that it would be unreasonable to expect the defendant to maintain all of its sidewalks (more than 22 miles) in such a perfect condition as to avoid the complained-of defect. After weighing the substantial utility, including cost of repair, against the minimal risk of the relatively small depression, the Court held that it was not an unreasonably dangerous defect and that it was manifest error to so find.

Standard of Review
As the Boyle decision did not reach the issue of standard of review and because of the conflict among the circuits, we first turn to the proper standard of review to be applied in cases involving findings of unreasonable risks of harm or unreasonably dangerous defects.
As stated, the Courts of Appeal have employed different standards of review in this context. The First Circuit, along with the Fourth, has applied the manifest error standard to the factual findings but not to the ultimate conclusion, E.g., Green v. City of Thibodaux, 94-1000 (La.App. 1st Cir. 10/6/96); 671 So.2d 399, writ denied 95-2706 (La.2/28/96); 668 So.2d 366 Doane v. Wal-Mart Discount Stores, Inc., 96-2716 (La.App. 4th Cir. 6/25/97); 697 So.2d 309, writ denied 97-1852 (La.10/17/97); 701 So.2d 1328, while the Third Circuit has generally applied a pure manifest error standard. E.g., Nichols v. Wal-Mart Stores, Inc., 97-625 (La.App. 3d Cir. 7/2/97); 698 So.2d 53, writ denied 97-2067 (La.11/14/97); 703 So.2d 628 (expressly rejecting the reasoning of Green).[1] However, it should be noted that the Third Circuit has occasionally applied the latter standard. Migues v. City of Lake Charles, 96-626 (La. App. 3 rd Cir. 11/06/96); 682 So.2d 946 (following Green).
We now reject Green, 671 So.2d 399, and find that the manifest error standard of review is the proper standard.
This is not a res nova. Though we have not specifically stated that the proper standard for reviewing a determination that a condition presented an unreasonable risk of harm, we have addressed the issue on several occasions. E.g., Tillman v. Johnson, 612 So.2d 70 (La.1993) (per curiam); Oster v. Dep't of Transp. and Dev., 582 So.2d 1285 (La.1991); Landry v. State, 495 So.2d 1284 (La.1986); Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). In Tillman, we stated that whether a defect presents an unreasonable risk of harm "is a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the facts." Tillman, 612 So.2d at 70 (citing to Entrevia, 427 So.2d 1146; Landry, 495 So.2d 1284; and Oster, 582 So.2d 1285). "The unreasonable risk of harm criterion entails a myriad of considerations and cannot be applied mechanically." Oster, 582 So.2d at 1288 (citing to Landry, 495 So.2d at 1287). The concept, which requires a balancing of the risk and utility of the condition, is not a simple rule of law which can be applied mechanically to the facts of the case. Id. Because of the plethora of factual questions and other considerations involved, the issue necessarily must be resolved on a case-by-case basis. Additionally, an appellate court, reviewing a cold record, is not in the best position to weigh and evaluate the evidence presented and make this determination. Rather, the original fact finder, viewing live testimony and evidence, is best positioned to make a determination so heavily laden with factual issues.
Because a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than-scientific standard, *365 a reviewing court is in no better position to make the determination than the jury or trial court. Consequently, the findings of the jury or trial court should be afforded deference and we therefore hold that the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. A reviewing court may only disturb the lower court's holding upon a finding that the trier of fact was clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880 (La.1993).
In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair. Boyle, 685 So.2d at 1083; Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983); Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971). Simply put: The trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others? W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 31 (5 th ed. 1984). The reviewing court must then evaluate the fact finder's determination under the manifest error standard of review.

The Parking Lot Expansion Joint
In the instant case, the trial court,[2] along with the appellate court, failed to consider the risk-utility balance, but rather merely found that the joint was a defect which caused the fall. Therefore, we must consider the risk-utility balance concurrently with our analysis of whether the fact finder was clearly wrong in reaching its conclusion.
The plaintiff tripped and fell on the crack between two of the several concrete blocks which make up the Wal-Mart parking lot. The height variance between the blocks was from ¼ to ½ inch. Notably, the blocks which comprise this parking lot and the expansion joint between them are similar in construction to the sidewalk blocks and joint present in Boyle, 685 So.2d at 1080. Also, both the retail parking lot here and the sidewalk in Boyle were subject to heavy pedestrian traffic.
Here, as in Boyle, we are dealing with a relatively small variance, indeed smaller than that in Boyle. The instant variance of ¼ to ½ inch is only half that of the ½ to 1 inch variance in Boyle. Thus, as we characterized the variance in Boyle as a "relatively small depression," the defect here is minimal indeed. As previously discussed, one cannot expect paved surfaces of streets, sidewalks, and parking lots to be free of all deviations and defects.
Our analysis, however, does not end there. We must also consider the accident history of the defect. Boyle, 685 So.2d at 1083. The instant defect was in a high traffic area with estimates of up to a potential six million pedestrians crossing the defect and, like Boyle, this was the first reported accident. Thus, the risk presented by this joint is in all aspects less hazardous than that addressed in Boyle.
Plaintiff asserts that this defect was more hazardous because it was located directly in front of the store where everyone has to pass and where the vehicular traffic is the heaviest. Indeed, plaintiff conceded at oral argument that not every ½ inch crack in the parking lot would be an unreasonable risk of harm, but contended that this one was because of its location "right in front of the store." We are unimpressed by this contention primarily because it is based on a false premise. The record, including testimony of the plaintiff's own expert and photographic evidence, reveals that the defect at issue was not located directly in front, but rather 40 yards away down one of the several traffic aisles in the parking lot. The location cannot be accurately characterized as "right in front," nor can it be distinguished from the adjacent traffic aisle. Furthermore, our analysis would not be different if the defect had in fact been located in the traffic lane immediately in front of the store. Each patron, save those dropped at the door, must traverse at least one traffic aisle before reaching the area of the parking lot adjacent to the entrance. Given the high overall volume *366 of pedestrian traffic in the lot, we would not find one defect adjacent to the entrance an unreasonable risk of harm, yet find the same defect reasonable simply because it is subject to only a third or fourth the total traffic.
As to weighing the social utility and cost of repair, the utility of paved parking lots is clearly apparent as unpaved parking lots would present far more hazards: potholes, wheel ruts, erosion damage, and infinite variations in elevation. As to the specific utility of expansion joints, they are necessary for safety and for maintenance of larger paved surfaces. The expansion joints allow for the concrete to expand and contract as it heats and cools due to weather. Absent the joints, the concrete blocks would contract and subsequently crack and split in the cold. Subjected to heat, the concrete would press against each other, cracking, shifting and buckling, which would produce far more hazardous deviations than the minor ¼ to ½ inch variation at issue here. Additionally, the cost of maintaining such an area would be prohibitive as it would necessitate frequent replacement of the fragmented concrete blocks. The utility of the expansion joint is clear.
The cost of repairing the defect is our final consideration. Contrary to the plaintiff's contention that "the defect could have easily been remedied for a minimal amount,"[3] the cost to eliminate all such minor defects is staggering. Plaintiff's argument incorrectly assumes that the defendant need only have smoothed the joint at issue. Such a contention simplistically overlooks the reality of the situation. A defendant would have to be able to accurately foresee which crack an individual would trip over. Even an elimination of all such elevation deviations in this entire parking lot would fall short of repairing the defect. To avoid liability, this defendant would have to either eliminate all such "defects" in all of its parking lots and sidewalks or cease doing business. Beyond that, parties having garde of the countless concrete parking lots, driveways, sidewalks, and streets throughout the state would likewise have to smooth such surfaces eliminating all elevation deviations of more than ¼ inch to avoid potential liability. Furthermore, such an enormous expense would not rest with the parties owning the paved surfaces, but rather the cost would be shifted either to the public through taxing in the case of government-owned surfaces or, in the case of privately owned concrete surfaces, to consumers via higher prices in retail or increased fees for contract parking. Beyond the cost of the initial smoothing, maintaining such surfaces free from defects is likely impossible, and is certainly cost-prohibitive.
Therefore, given the negligible size of the defect, being even less than that which we considered in Boyle, along with the absence of previous accidents, and because the utility of parking lot expansion joints far outweighs the minimal hazard, and because the cost of repair and maintenance is prohibitive, we find that the instant defect could not present an unreasonable risk of harm and that such a finding was therefore clearly wrong. Conversely, we find that such a "defect" is entirely reasonable.

DECREE
For the foregoing reasons, we find that the lower courts were clearly wrong in holding that the expansion joint at issue presented an unreasonable risk of harm. Therefore, the judgments of the lower courts are reversed.
REVERSED.
KIMBALL, J., concurs and assigns reasons.
CALOGERO, J., concurs for reasons assigned by KIMBALL, J.
LEMMON, J., concurs and will assign reasons.
KIMBALL, Justice, concurring.
I concur with the holding that the proper standard for reviewing a finding of an unreasonable risk of harm is the manifest error standard. Furthermore, I concur in the result *367 agreeing that the uneven expansion joint in this case did not present an unreasonable risk of harm. However, I disagree with the conclusion the lower courts failed to consider the risk-utility balance in its determination of whether the variance in question presented an unreasonable risk of harm.
In his three page "Reasons for Ruling," the trial judge specifically stated the condition could have been corrected with a minor repair and concluded, "The magnitude and risk of harm posed by this defect in the walkway certainly outweighs the feasibility and cost utility of minor repair as stated by the expert." The majority opinion, at footnote 3, recognized the trial judge made this statement, but noted that he did not address or consider any of the other aspects of the risk-utility balance. The majority opinion then concluded that this statement indicated he only considered one factor in the risk-utility balance. I disagree with this conclusion. The trial judge in this case very well may have considered the other aspects of the risk-utility balance in his determination of the unreasonable risk of harm, but only mentioned the cost of repair vis-a-vis the magnitude of the risk because that was the only aspect of the balancing test in question. This is especially true in this case where there was undisputed evidence concerning the size and location of the variance, the history of the defect and parking lot in general, and the obvious social utility of paved walkways and parking facilities. I feel that if we were to require the trial court to provide a "mantra" of the steps in reaching their conclusions we would certainly be engaged in micro-management of the lower courts, a truly undesirable result.
While I disagree with the opinion's conclusion the trial judge did not properly apply the risk-utility test, I agree with its ultimate conclusion, the expansion joint did not present an unreasonable risk of harm. As noted, the trial judge stated the cost of repairing this expansion joint was minimal. Based on the testimony of the plaintiff's expert and the evidence presented, the trial judge's conclusion was manifestly erroneous.
During his presentation, plaintiff's counsel called Mr. Gene Moody who was accepted by the trial judge as an expert in civil and safety engineering. Mr. Moody testified the expansion joint in question could be repaired two ways: by filling the uneven expansion joints with "some asphalted concrete" or by overlaying the entire parking lot with an inch of asphalt. Mr. Moody also testified that in between the time of the accident and his inspection of the lot, "there had been some patching ... [which] would have made the area safer." Furthermore, the patching which had been done was "very similar" to the first solution he proposed. However, Mr. Moody conceded, and the photographs of the scene he took on April 15, 1996, reveal, the patching done by the defendant did not repair the problem. Mr. Moody stated when he went to the parking lot to make his inspection, there was, despite the patching, a ¼ to ½ inch difference in elevation at the expansion joint. In his opinion, it would have been "wise" to overlay the entire lot and while overlaying the lot was expensive, it was a long term solution to the problem.
Mr. John Robert Reed, the plaintiff's son, also testified on Ms. Reed's behalf. Mr. Reed stated that in May of 1995, he and his mother returned to the scene and took a Polaroid photograph of the area where Ms. Reed fell. This photograph was admitted into evidence as plaintiff's exhibit-3. The Polaroid taken by Mr. Reed in May of 1995, is dissimilar from the photographs taken by Mr. Moody, eleven months later, in that the earlier photograph reveals the expansion joints without any patching. Whereas, the later photographs reveal the same area, eleven months later, patched, the curative recommendation made by Mr. Moody at trial was ineffective. Significantly, a cursory comparison of the two photographs in conjunction with a review of Mr. Moody's testimony reveal that one of Mr. Moody's solutions to the problem at issue, patching, was no solution at all. In the eleven months between the taking of the two sets of photographs, the expansion joint in question had been "repaired" and reverted to its original state. The minimal cost of repair, as opined by the trial judge, was no repair at all. Mr. Moody stated that in making the repair, there were two possible choices: patching, which was *368 "cheap" in terms of cost, but would present only a short term solution, or overlaying the entire parking surface with ½ inch of asphalt, which was more expensive, but a long term solution. Patching, as a method of "repair" proved to be a short term solution indeed.
Therefore, it is my opinion that the trial judge properly addressed all of the factors to be considered in the risk-utility balance, yet did so in a manifestly erroneous manner. The evidence presented and the testimony reveal the cost of repair was not minimal. Therefore, I concur in the result that the expansion joint at issue did not present an unreasonable risk of harm.
NOTES
[*] Victory, J., not on panel. Rule IV, Part 2, § 3.
[1] In the instant case the Third Circuit also applied the manifest error standard of review.
[2] This case was tried without jury.
[3] In his Reasons for Ruling, the trial court likewise characterized the repairs as minimal and although that does show that the trial court considered cost of repair, one factor of the risk-utility balancing, the court did not address nor consider any other aspect of the balancing test.