834 So.2d 610 (2002)
Alicia SOLITO and Joe Solito, Individually and as Husband and Wife, Plaintiffs-Appellees,
v.
HORSESHOE ENTERTAINMENT, a Louisiana Partnership, d/b/a Horseshoe Casino Hotel, Defendant-Appellant.
No. 36,667-CA.
Court of Appeal of Louisiana, Second Circuit.
December 18, 2002.
*612 Rountree, Cox, Guin & Achee by Dale G. Cox, Shreveport, for Appellant, Horseshoe Entertainment.
Rice & Kendig, by M. Carl Rice, William F. Kendig, Shreveport, for Plaintiffs, Alicia and Joe Solito.
Cook, Yancey, King & Galloway, by Sidney E. Cook, Jr., Shreveport, for Defendants, St. Paul Fire & Marine Ins. Co., Whitaker Construction Co., and Manhattan Construction Co.
Before STEWART, GASKINS and CARAWAY, JJ.
CARAWAY, J.
The plaintiff in this case was injured after she tripped and fell within a temporary walkway constructed near the entrance to the defendant's hotel. The trial court found that an unreasonable risk of harm existed because of an unexpected drop-off or step within the walkway. Finding no manifest error in the trial court's rulings, we affirm.

*613 Facts

On Saturday, November 22, 1999, Alicia and Joe Solito went to Horseshoe Casino during the hotel grand opening weekend to dine at one of the restaurants. Although the hotel was not completely finished, Horseshoe proceeded with the scheduled grand opening anyway. In preparation for the grand opening, Horseshoe asked the general contractors, Manhattan Construction Company and Whitaker Construction Company, Inc. ("Manhattan-Whitaker"), to pour a temporary concrete ramp exiting the parking garage to the new hotel. The ramp would allow patrons to avoid an unfinished area of the hotel that was to be off limits to the public. Instead of following the sidewalk, which curved around and adjacent to the unfinished construction area, the patrons would leave the sidewalk in front of the garage exit and walk down the ramp to the parking and driveway entrance area. After walking across that driveway entrance area, the patrons would enter the hotel at doors away from the construction area.
The curb of the sidewalk where the ramp began was approximately six inches above the level of the surface of the driveway entrance, as shown by Plaintiff's Exhibit 11-K which is an appendix to this opinion. The ramp was four-feet wide and approximately eight-feet long. The sides of the concrete ramp were also sloped down to the driveway level. Manhattan-Whitaker had been asked to comply with the accessibility regulations of the Americans with Disabilities Act (ADA). Horseshoe erected a temporary canopy over the ramp. The ramp which was poured two days before the accident was removed about three weeks later.
The accident occurred as the Solitos exited the garage and encountered the ramp with a group of other patrons walking immediately in front of them. When Alicia got to the ramp, her location along the path of travel caused her right foot to just miss the ramp and step off the curb and abruptly down into the six-inch drop-off on the right side of the ramp. The resulting fall caused Alicia to hit her head on the concrete, bruising her face and left knee. She also fractured a finger and broke off a bottom middle front tooth at the gum line.
The first doctor Alicia saw after the accident was her plastic surgeon, because she was concerned about bruising on her face. She also saw a hand surgeon for her broken finger, and an orthopedic surgeon for wrist, neck and knee pain. She also went to the dentist for the broken tooth which she had super-glued back because of embarrassment over her appearance. She continued to work as a court reporter while her injuries healed, even though two fingers on her left hand were "buddy-taped" together. She underwent physical therapy for myoligamentous and myofascial sprains and strains to the cervical region of her spine.
As a result of the accident, plaintiffs filed suit against Horseshoe Entertainment. Horseshoe brought a third party demand against the hotel contractors, Manhattan Construction Company and Whitaker Construction Company, Inc. ("Manhattan-Whitaker"), and their liability insurer, St. Paul Fire & Marine Insurance Company ("St. Paul"), asserting a contractual indemnity claim. The Solitos subsequently amended their petition to add these defendants. Manhattan-Whitaker asserted a third party claim against the subcontractor and its insurer which was dismissed prior to trial.
Before trial, Horseshoe filed motions in limine to exclude photographic evidence and expert testimony. After a bench trial, the trial court's opinion characterized the transition ramp as a "temporary makeshift entranceway" and found that the ramp *614 created an unreasonably dangerous condition. Accordingly, the trial court rendered judgment finding Horseshoe 100% at fault for the accident. It awarded Alicia damages of $38,772, loss of consortium damages to Joe for $5,000, and dismissed Manhattan-Whitaker. It is from this judgment that Horseshoe appeals.

Discussion
The trip and fall in this case resulted from the ramp and walkway designed to lead patrons into Horseshoe's hotel. The ramp/walkway area is therefore a thing in the custody and control of Horseshoe which is claimed to be defective and the cause of the accident. The applicable law for the claim is Civil Code Article 2317.1, which provides, in pertinent part, as follows:
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.
The enactment of La. C.C. art. 2317.1 effectively turns strict liability claims into negligence claims. Whitaker v. City of Bossier City, 35,972 (La.App.2d Cir.4/5/02), 813 So.2d 1269.
Horseshoe argues that the construction and location of the temporary ramp did not present an unreasonable risk of harm. There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-fact, we note that many factors are considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved. Lasyone v. Kansas City S. R.R., 2000-2628 (La.4/3/01), 786 So.2d 682.
The concept of whether a defect presents an unreasonable risk of harm, which requires a balancing of the risk and utility of the condition, is not a simple rule of law which can be applied mechanically to the facts of the case. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362; Oster v. State, through Dep't of Transp. & Dev., 582 So.2d 1285 (La.1991). Because a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than-scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court. Reed, supra. Consequently, the findings of the jury or trial court should be afforded deference ... the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard. A reviewing court may only disturb the lower court's holding upon a finding that the trier of fact was clearly wrong or manifestly erroneous. Reed, supra, (citing Stobart v. State, through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993)); Priest v. City of Bastrop, 34,841 (La.App.2d Cir.7/11/01), 792 So.2d 80; Blackwell v. Bossier Parish School Bd., 32,383 (La.App.2d Cir.12/8/99), 747 So.2d 1248; Henderson v. Sutherland's Lumber Co., 31,714 (La.App.2d Cir.3/31/99), 733 So.2d 667.
A portion of the sidewalk, blocked off with yellow caution tape to shield patrons from the unfinished construction, curved and ran immediately parallel to the temporary ramp as shown in the attached photo. This created a gap 20 inches wide *615 between the sloped side of the ramp and the curb of the blocked-off sidewalk. Horseshoe placed a canopy over the ramp anchored by temporary poles on the left side of the ramp, extending over the ramp and gap and attached to poles on the opposite side, along the blocked-off portion of the sidewalk. Additionally, to protect the patrons from inclement weather, a plastic covering was draped down from the canopy on the left side of the ramp. In summary, the patrons were directed to travel through a temporary walkway which was primarily an enclosed passageway approximately sixty-eight inches wide comprised of the four-foot wide ramp and the 20-inch gap between the ramp and blocked-off sidewalk.
In finding that this passageway presented an unreasonable risk of harm, the trial court concluded:
The manner in which the temporary handicap ramp was constructed did create an approximate six-inch abrupt change in elevation, or drop-off, in a certain portion of the pedestrian walkway. As the pictures introduced into evidence indicate ..., the condition existed only as to a portion of the walkway. In other words, the majority of the pedestrian traffic was not exposed to this condition. If a group of pedestrians was walking along the walkway only the person unlucky enough to be within the twenty-inch "gap" would be exposed to this condition. For instance, a person in Ms. Solito's situation would notice that people walking in front of her to her left and right would not be experiencing an abrupt change in elevation. There would be no reason to expect, nor was there any warning of this "gap." The fact that only those people within this twenty-inch area were exposed to this "gap" probably explains why more people were not injured during the existence of this temporary makeshift entranceway.
The trial court concluded that "the use of the canopy and yellow tape directed the pedestrian traffic directly across the dangerous area."
Horseshoe argues that a six-inch drop-off from curb to street is standard and reasonable and that the ramp was constructed in compliance with all codes and the ADA. It also argues that the trial court failed to make a utility/risk analysis. We disagree with these arguments.
In the context of the specially configured enclosed corridor, pedestrians moving in a group would not necessarily view the walkway as requiring an ordinary step-down from the sidewalk to street level and therefore would not expect to encounter such a hazard. The probability that a crowd of people would move together out of the parking garage could reasonably be expected by Horseshoe for its grand opening. Although the trial court's opinion did not specifically discuss the burden of adequate precautions, there is no mechanical formula for the utility/risk analysis. Certainly, implicit from the attached photo of the accident scene, evidence of efficient and simple remedial measures was undisputed before the trial court. A simple orange construction barrel could have been moved into the 20-inch gap area to warn a crowd of pedestrians regarding the danger.[1]
*616 In summary, we are in agreement with the trial court's conclusion that "the combination of all of these factors created an unreasonably dangerous condition." The unique circumstances of this makeshift, temporary passageway posed an unreasonable risk of harm.
As a related assignment of error, Horseshoe argues that the trial court erred in denying Horseshoe's motion in limine to exclude or limit the testimony of the Solitos' engineering expert. Horseshoe argues that the expert's videotaped deposition offered certain opinions about the danger of the ramp construction and that the methodology used by him in reaching those opinions did not comport with the guidelines established under Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Furthermore, Horseshoe argues that the expert was not qualified by experience, training or education to render opinions on the issues in question, and that under La. C.E. art. 702,[2] his opinions should be excluded.
The Solitos' expert obtained a civil engineering education and possessed actual experience related to human factors and traffic engineering for the planning and construction of parking lots and pedestrian pathways. His experience-based testimony assessing the unique makeshift walkway in question could be of some value to the trier-of-fact. Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based, as well as the professional qualifications and experience of the expert. Lyons v. J.A. Auger, Inc., 35,691 (La.App.2d Cir.6/12/02), 821 So.2d 536, 540; writ denied, 2002-2337 (La.11/15/02), 829 So.2d 437.
From our review, we find no abuse of discretion in this bench trial setting. Even assuming the expert's testimony was improperly admitted under Daubert, the admission would be subject to harmless error analysis. Wehbe v. Waguespack, 98-475 (La.App. 5th Cir.10/28/98), 720 So.2d 1267; writ denied, 98-2907 (La.1/15/99), 736 So.2d 211. As the federal courts hold for such expert testimony in bench trials, "reversal is only warranted if all of the competent evidence is insufficient to support the judgment, or if it affirmatively appears that the incompetent evidence induced the court to make an essential finding which it otherwise would not have made." St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402 (5th Cir.2000). The expert's reconstruction and analysis of this walkway accident provided no incompetent opinion evidence which adversely affected the trial court's finding of unreasonable risk of harm.
Next, Horseshoe raises causation as an error based upon Alicia's various descriptions of her fall. In her pretrial deposition, Alicia gave different descriptions of the location of her foot in relation to the twenty-inch-wide drop-off area. At trial, she indicated that she stepped into a depression or trench in the concrete at the point where the edge of the sloped side of the ramp ended. That point would be approximately six or more inches below the top of the curb of the sidewalk. Alicia also indicated that her heel stuck in the depression area at the time of her fall.
*617 Horseshoe disputes the depression area or trench and claims that causation for the fall was not clearly established. We disagree.
Alicia's best evidence of her fall was a photo of her approximate position stepping into the drop-off area taken a few days after the accident before the ramp's removal. The photo, Plaintiff's Exhibit 11-E, shows Alicia stepping down into the drop-off with her right foot landing immediately next to the edge of the ramp. Below her foot appears to be loose gravel which may amount to the claimed depression in the concrete. Regardless of the existence or depth of the trench or whether Alicia's heel caught in the hole, the existence of an abrupt drop-off at that location is undisputed and can be reasonably considered as the primary cause of the accident.
The next issue of comparative fault raised by Horseshoe challenges the trial court's conclusion that the drop-off was unexpected and unnoticeable by Alicia. A plaintiff/pedestrian has a duty to see and avoid obvious hazards. Morace v. Melvyn's Restaurant, Inc., 30,988 (La. App.2d Cir.9/23/98), 719 So.2d 139. Nevertheless, this is a facts-and-circumstances inquiry, and we find no manifest error in the trial court's finding of no comparative fault in this case.
Alicia testified that she and her husband had just gotten out of the garage elevator with a large group of young people who were walking immediately in front of her. The uniform gray concrete color of the sidewalk and ramp gave no indication of a change in surfaces. The enclosed corridor, as indicated above, did not alert Alicia to expect a transition from the sidewalk down to the street level. It was not unreasonable under the crowded conditions for Alicia and her husband to be proceeding in close proximity to the group of patrons in front of them. Persons walking in front of her who entered the ramp did not give her any indication of a step. Under these circumstances, the trial court was not clearly wrong in failing to assess fault to Alicia.
Horseshoe argues that the trial court erred in finding that all of Alicia's dental injuries were caused by the accident, and awarding her $9,920 for dental treatment already obtained and $1,870 for future dental work. It argues that Alicia is only entitled to special damages of $1,005, representing the expense of restoring her one broken tooth.
A plaintiff may ordinarily recover reasonable medical expenses, past and future, incurred as a result of the injury. Rhodes v. State, through Dep't of Transp. & Dev., 94-1758 (La.App. 1st Cir.12/20/96), 684 So.2d 1134; writ not considered, 97-0242 (La.2/7/97), 688 So.2d 487. The plaintiff bears the burden of proving the causal relationship between the accident and the injury by a preponderance of the evidence. Marshall v. Caddo Parish School Bd., 32,373 (La.App.2d Cir.10/29/99), 743 So.2d 943; Rhodes, supra. The test is whether a plaintiff has shown through medical testimony that more probably than not, the subsequent medical treatment was necessitated by the trauma suffered in the accident. Rhodes, supra. In assessing damages, much discretion is left to the trier-of-fact. La. C.C. art. 2324.1; Scott v. Pyles, 99-1775 (La. App. 1st Cir.10/25/00), 770 So.2d 492; writ denied, XXXX-XXXX (La.1/26/01), 782 So.2d 633; Juge v. Judson, 94-579, 94-580 (La. App. 5th Cir.1/18/95), 650 So.2d 312; writ denied, 95-0425 (La.3/30/95), 651 So.2d 846; Choyce v. Sisters of the Incarnate Word, 25,958 (La.App.2d Cir.8/19/94), 642 So.2d 287; writ denied, 94-2510 (La.12/9/94), 647 So.2d 1119; Chambers v. Graybiel, 25,840 (La.App.2d Cir.6/22/94), *618 639 So.2d 361; writ denied, 94-1948 (La.10/28/94), 644 So.2d 377. Before an appellate court may disturb an award of damages, the record must clearly show the trial court abused its broad discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993); Scott v. Pyles, supra.
Ten days after the accident, Alicia's family dentist evaluated her dental injuries and, responding to a request from Alicia's attorney, concluded that only one tooth was directly involved in the accident. This tooth (# 25) broke off at the gum line when Alicia fell. The following month, the dentist prepared a treatment plan describing extensive dental repairs, including extractions, root canals, crowns with posts, bridges, and a lower partial plate, all involving Alicia's lower jaw.
Horseshoe argues that Alicia's recovery of special damages should be limited to $1,005, pursuant to the dentist's initial evaluation. Dr. Gaensehals testified by deposition concerning this difference between the initial report and his treatment plan. He testified that trauma to a tooth is cumulative and that it was not unusual for an injury to the tooth to manifest itself at a later time, even years later. In his opinion, all of the restorative work performed on Alicia was either directly related to or aggravated by the trauma of the accident. He characterized the damage to the teeth surrounding tooth # 25 as indirect trauma, also caused by the accident.
The trial court concluded in written reasons that Alicia proved that her injuries were directly caused by her fall and that she proved all of the items of special damages for medical and dental treatment, and physical therapy. We find no reversible error in the exercise of the trial court's discretion regarding this assignment.
Finally, Horseshoe claims, in the alternative, that Manhattan-Whitaker should be assessed a portion of the fault for the defect in the ramp and walkway. Additionally, it claims that Manhattan-Whitaker owed it indemnity for the Solitos' claims because of the construction contract.
The evidence shows that Manhattan-Whitaker's construction of the ramp was made at the request of Horseshoe for the grand opening celebration. A review of the written contract for the overall construction project reveals that the definition of the "Project" and the concept of the "Work" as used in the written indemnification agreement extended only to the hotel project. This additional special project for the ramp was an oral agreement which was unrelated to the main project and therefore beyond the scope of the written contract.
Regarding Manhattan-Whitaker's alleged fault for the defective walkway, there were three significant facts which were undisputed. First, the ramp was constructed in accordance with good construction practices, complied with ADA standards, and accepted by Horseshoe as proper. Second, the poles and canopy were installed by another party at Horseshoe's direction. Finally, Horseshoe placed the yellow tape and plastic siding which, in combination with the placement of the canopy poles, served to direct the pedestrian traffic across the dangerous hazard. The hazard, therefore, could have been easily avoided by proper direction of pedestrians directly across the ramp or by placing a hazard warning, such as an orange construction barrel, in the drop-off area. Accordingly, we agree with the trial court's assessment and find no fault by Manhattan-Whitaker.

Conclusion
Based upon our review of Horseshoe's assignments of error, we find the trial court's conclusions reasonable, presenting *619 no manifest error of fact and in accordance with the law. The judgment is affirmed at the cost of Horseshoe.
AFFIRMED.

NOTES
[1] Horseshoe also made a separate assignment of error concerning the trial court's denial of its motion in limine to preclude evidence of Horseshoe's subsequent remedial measure employing the construction barrel. For the same reason, since the evidence of a simple corrective measure was circumstantially already before the court, we find no prejudice from the trial court's ruling on the subject of remedial measures.
[2] La. C.E. art. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.