852 So.2d 1229 (2003)
Kathleen REITZELL, Plaintiff-Appellant,
v.
PECANLAND MALL ASSOCIATES, LTD., Defendant-Appellee.
No. 37,524-CA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 2003.
*1230 McLeod Verlander by Laurie J. Burkett, Monroe, for Appellant.
*1231 Plauché, Maselli, Landry, & Parkerson by Cherie T. Burlett, New Orleans, for Appellee, Southeast Service Corporation.
Davenport, Files & Kelly by Carey B. Underwood, Monroe, for Appellee, Southwest Shopping Centers Co.
Before BROWN, CARAWAY and TRAYLOR (Pro Tempore), JJ.
CARAWAY, J.
In this trip and fall case, the trial court granted summary judgment in favor of the mall owner and cleaning company after finding that a patched area at one of the mall entrances did not present an unreasonable risk of harm and that any unevenness in the location was open and apparent. We affirm.

Facts
On the Friday evening of March 12, 1999, Kathleen Reitzell did some after-work shopping at Pecanland Mall in Monroe, La. It had rained earlier in the day and the mall exits were wet. Reitzell exited the mall between 6:30 and 7:30 p.m. She crossed a walkway area to enter the parking lot by way of the slightly-declining handicap ramp. As Reitzell reached the end of the ramp, her right foot encountered the place of transition between the light beige tile walkway and the asphalt parking lot. At that point, some of the last tiles were missing, and the area where the tiles had been located was patched with a black asphalt-like substance. At that location as she began to enter the crosswalk area marked on the asphalt, Reitzell fell, injuring her right shoulder and lower back.
On March 9, 2000, Reitzell named the mall owner/operator, Southwest Shopping Centers, Co. ("Southwest"), and the mall cleaning service, Southeast Service Corporation ("Southeast"), in a suit for damages claiming that the damaged tile walkway and improperly applied asphalt presented a defect in the mall premises. Both defendants sought summary judgments on the grounds that Reitzell would be unable to show that an unreasonably dangerous condition existed. After hearing the arguments of counsel, the trial court granted the motions for summary judgment for the defendants. This appeal ensued.

Discussion
A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B. This article was amended in 1996 to provide that the summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2); Racine v. Moon's Towing, 01-2837 (La.5/14/02), 817 So.2d 21. In 1997, the legislature enacted C.C.P. art. 966 C(2), which further clarified the burden of proof in summary judgment proceedings. This provision first places the burden of producing evidence for summary judgment on the mover (normally the defendant), who can ordinarily meet the burden by submitting affidavits or by pointing out the lack of factual support for an essential element of the opponent's case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. Racine, supra, citing Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 6.8 (1999). Once the motion for summary judgment has been properly supported *1232 by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Racine, supra. Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Gray v. Investment Cars Unlimited, Inc., 36,691 (La.App.2d Cir.1/29/03), 836 So.2d 1184, writ denied, 03-0670 (La.5/2/03), 842 So.2d 1108.
La. C.C. art. 2317.1 provides that the owner or custodian of a thing is answerable for damages occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. This article effectively turns strict liability into negligence claims. Solito v. Horseshoe Entertainment, 36,667 (La. App.2d Cir.12/18/02), 834 So.2d 610. La. C.C. art. 2317.1 actions require proof that the defendant had custody of the thing causing the injury, that the thing contained a defect, this is, a condition creating an unreasonable risk of harm and that the defective condition caused plaintiff's injury. Davis v. Diamond Shamrock Refining and Marketing Co., 34,309 (La.App.2d Cir.12/6/00), 774 So.2d 1076.
There is no fixed rule for determining whether the thing presents an unreasonable risk of harm. The trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligation, the social utility, and the cost and feasibility of repair. Simply put: The trier of fact must decide whether the social value and utility of the hazard outweigh, and thus justify, its potential harm to others. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362. The concept of whether a defect presents an unreasonable risk of harm, which requires a balancing of the risk and utility of the condition, is not a simple rule of law which can be applied mechanically to the facts of the case. Solito, supra.
The degree to which a danger is evident to a potential victim is one factor in determining whether the condition is unreasonably dangerous. Joseph v. City of New Orleans, 02-1996 (La.App. 4th Cir.3/5/03), 842 So.2d 420. See also, Williams v. City of Baton Rouge, 02-0682 (La.App. 1st Cir.3/28/03), 844 So.2d 360; Shavers v. City of Baton Rouge, 00-1682 (La.App. 1st Cir.9/28/01), 807 So.2d 883. The accident history of the defect is also a relevant consideration in the unreasonable risk evaluation. Reed, supra; Boyle v. Board of Sup'rs, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080.
The courts have recognized that it is common for the surfaces of streets, sidewalks and parking lots to be irregular and that it is not the duty of the party having garde of these locations to eliminate all variations in elevations existing along the countless cracks, seams, joints and curbs. These surfaces are not required to be smooth and lacking in deviations because such a requirement would be impossible to meet. Reed, supra. This fact alone, however, is insufficient to eliminate the defendants' liability under the unreasonable risk analysis. Id.
From our review of the evidence, we agree with the trial court's conclusion that the patched area between the ramp's missing tiles and the asphalt parking lot and driveway did not present an unreasonable risk of harm. The exit area immediately outside the mall where the accident happened requires patrons to either descend down the handicap ramp or step off *1233 of the adjacent curb onto the asphalt parking lot. The tile extends from the entrance doors of the mall all the way out to the curb or down the ramp. Clearly, a patron must be aware, whether stepping off the curb or walking down the ramp, that a transition of surfaces and elevations will occur.
Along the final row of the ramp's tiles before the beginning of the asphalt, some of the 5" by 5" (approximate size) tiles were either totally missing or partially cracked and removed. To replace those tiles, the maintenance supervisor testified that he had applied an asphalt substance called Black Patch. He had poured the patch material into the area of the missing tiles and had run his vehicle over the asphalt to flatten and smooth the patch. The patched area thus bridged the asphalt of the parking lot with the tile ramp.
In her deposition, Reitzell stated that when she fell, her foot hit something and she "just fell." She believed she fell because of the asphalt repair and insisted that she did not slip on the tile surface due to the rain. Reitzell admitted that at the time of the fall she noticed no change in color between the tile and the asphalt although in her deposition she admitted that she could see the contrasting colors. She surmised that the drop in elevation between the tile and asphalt was "probably not more than a half inch." Reitzell testified that the asphalt patch contained bumps which produced a difference in elevation. Reitzell went to the location six days after the accident and took pictures which were produced as evidence.
The affidavit of Jim Parker, mall operation manager, stated that the thickness of the tile located outside of the mall exit measured one-quarter inch. Parker was unaware of any other accidents at the location of Reitzell's fall and stated that he routinely inspects that location and saw no change in elevation at the area of the patch in question.
Gary Taylor, the Public Safety Director of the mall, stated in an affidavit that approximately 550,000 other people had used the food court exit in the condition it was at the time of Reitzell's fall. He also was unaware of any other accident at the site.
With this situation, the parties agree that a foreign substance or the rainwater did not cause Reitzell's fall. It is also undisputed that the elevation dropped between the last 1/4-inch tile and the asphalt patch so that Reitzell did not hit a higher surface and stub her toe causing the fall. We may also consider that there was a change in the texture of the surface where Reitzell's foot landed on the patch at the end of the ramp as she began her entrance into the asphalt crosswalk. Nevertheless, these accepted facts present an expected risk for the transition zone from the tiled area of the entrance out onto the asphalt crosswalk and parking lot. The pedestrian patron must expect surface and elevation change to occur at that location. The fact that the asphalt of the parking lot, or in this case, the first few inches of asphalt patch before the parking lot, may be a different texture and not entirely level and uniform is to be expected. Just as the pedestrian must use caution in slowing and looking down in stepping off the curb onto the parking lot, Reitzell had reached the end of the ramp where the use of some similar caution would ordinarily be expected to protect against the irregular surface changes caused by the patch.

Conclusion
The facts surrounding the condition of the patched area at the end of the ramp do not present genuine issues of material fact. That evidence is insufficient to support a conclusion that the asphalt patch presented an unreasonable risk of harm. The *1234 trial court's granting of summary judgment is affirmed. Costs of appeal are assessed to appellant.
AFFIRMED.