938 So.2d 1198 (2006)
Nancy C. BUCHIGNANI, Plaintiff-Appellee
v.
LAFAYETTE INSURANCE COMPANY, et al., Defendant-Appellant.
No. 41,384-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2006.
*1200 Lunn, Irion, Salley, Carlisle & Gardner, by James A. Mijalis, Shreveport, for Defendant Appellant, Lafayette Ins. Co. and Sci-Port Discovery Center.
Sockrider, Bolin, Anglin, Batte, by James E. Bolin, Jr., Shreveport, for Plaintiff Appellee, Nancy C. Buchignani.
The Malone Law Firm, by Dannye W. Malone, Shreveport, for Defendant Appellee, City of Shreveport.
Before STEWART, CARAWAY and PEATROSS, JJ.
STEWART, J.
Nancy C. Buchignani, the plaintiff, tripped at an expansion joint and fell down six concrete steps. She sued Sci-Port Discovery Center, Lafayette Insurance Company (Sci-Port's insurer), and the City of Shreveport for damages. The claims against the City of Shreveport were dismissed at trial and are not at issue. As to the claims against Sci-Port and its insurer, the trial court determined that the defect at the expansion joint presented an unreasonable risk of harm and found Sci-Port at fault. The trial court assessed Ms. Buchignani with thirty percent comparative fault and awarded total damages of $50,000, reduced by her percentage of fault to $35,000. On appeal, Sci-Port argues that the trial court erred in finding the defect to be an unreasonably dangerous condition and in assessing the plaintiff with only thirty percent comparable fault. Ms. Buchignani answered the appeal, asserting error in the trial court's assessment of fault to her. Finding no reversible error, we affirm.

FACTS
The accident occurred on November 28, 2003, as Ms. Buchignani, age 66, was departing Sci-Port with her two sons, daughter-in-law, and grandchild. They walked along the outdoor plaza to the steps leading down to the north parking lot. Mrs. Buchignani's oldest son, Dan, was about ten feet ahead of her with his family, and her younger son, Brian, was about six to ten feet behind her.
The plaza was made of poured concrete slabs with numerous expansion joints. The expansion joints facilitated independent movement of the slabs to reduce the potential for stress cracking. Photographic evidence shows an expansion joint at the top of the steps alongside a concrete slab just ahead of the top step and in front of the handrails. The steps have handrails on both sides and a rail in the middle. Ms. Buchignani tripped at the expansion joint before reaching the first step.
*1201 Ms. Buchignani, whose left hand was in a cast at the time of the accident, gave the following account of how the accident occurred:
Well, I was walking toward the steps at a reasonable pace, and what I remember is when my right foot landed on the platform before you go down the stairs, and then my left foot tripped. And I think I was in the process of probably getting ready to hold on to the rail on the right-hand side, but I was in the middle. And I guess my plan was to walk off toward where I could reach the rail, but where my foot caught on something. . . .
Ms. Buchignani marked her approach to the steps on a photograph. She placed herself just to the right of the middle rail. She testified that when she tripped, she was unable to grab the nearest rail, which was the middle rail, due to the cast on her left hand, so she turned her body to try to grab the middle rail with her right hand. She was unable to reach the rail and fell down the six concrete steps. She sustained injuries to her head and right hip area, and she lost consciousness momentarily.
Brian Buchignani saw his mother's foot catch on something and then watched her fall down the steps. He rushed to her aid and held her head until she regained consciousness. Dan Buchignani did not see the accident, but he saw his mother lying on the pavement at the bottom of the steps. After having someone call 911, Dan, who worked as a claims adjuster, retrieved a camera from his vehicle and photographed the accident scene. He measured and photographed the difference in elevation at the expansion joint where his mother tripped. The photograph taken by Dan shows a height variance of one and one-half inches at the joint.
Mr. Harold E. Hunt, III, an operations assistant at Sci-Port, was notified after the accident occurred and saw Ms. Buchignani at the bottom of the steps. He testified that there was a slight raise in elevation between the step and the plaza area and that the condition had been there since he began working at Sci-Port in August 2002. He used the steps numerous times and did not see the defect as a problem. He knew of no prior accidents.
Mr. Munkith Al-Najjar, Sci-Port's CEO who was senior vice-president with responsibility for operations and building maintenance at the time of the accident, also had not noticed the difference in elevation at the joint by the steps prior to the accident. Mr. Al-Najjar testified that he sometimes used the steps. He also used the ramp, which was available as an alternative route to the parking lot at the time of the accident. According to Mr. Al-Najjar, Sci-Port receives around 200,000 visitors each year. Most visitors use the north entrance where the accident occurred, because it is nearer to the parking lot. He did not know of any prior accidents at the steps or of any complaints regarding the condition of the area around the steps. Mr. Al-Najjar testified that he was notified about the accident on the following Monday. He inspected the area and noticed a separation between the plaza and a slab by the steps. He said the separation looked to be "an inch or less." He then contacted the architect who designed the building and learned that the problem was due to normal settling and that it would get worse. The steps were closed to traffic. Signs directing visitors to use the ramp instead of the steps were made by the graphic arts department at Sci-Port and posted at the steps.
An agreement entered into by the City of Shreveport and Sci-Port in 1998 sets forth the duties of each party. Though the *1202 City of Shreveport owns the immovable property and building in which Sci-Port operates, Section 2.2 of the agreement gives Sci-Port the exclusive right to possession and occupancy of the property and "to manage, operate and provide all services for the Center and the Outdoor Exhibits, including but not limited to the maintenance of all buildings, exhibits and facilities (except for major repairs . . . to be done by the City of Shreveport)." Mr. Al-Najjar testified that he notified the City of Shreveport about the defect either Tuesday or Wednesday after the accident. A purchase order and an invoice for the City of Shreveport shows that the repairs were made in August 2004, at a cost of $1,790.00.
Following the accident, Ms. Buchignani was diagnosed with cervical strain and blunt trauma to the right hip at the emergency room. She was given pain medication and advised to follow-up with her physician. On December 2, 2003, she saw Dr. Wen Liu, an internal medicine specialist, for complaints of neck pain, chest wall pain, and blurred vision in her right eye. She also sought treatment for blurred vision and headaches from her ophthalmologist, Dr. David D. Bryan, who related her problems to the accident. Dr. Bryan J. Verkovius, a specialist in neuro-ophthalmology, also found Ms. Buchignani to have suffered some visual loss with headaches as well as significant dry eye syndrome related to the closed heard injury she sustained. In February 2004, she sought treatment from Dr. Henry J. Hollier, an ear, nose and throat specialist, for recurring headaches and left ear pain. Dr. Hollier found she had significant post-traumatic muscle spasms on the left side of her head. The medical evidence further showed that Ms. Buchignani sustained aggravation of a pre-existing TMJ condition from the accident, resulting in pain, headaches, and earaches that was ongoing at the time of trial and would possibly continue up to another year.
Regarding her medical history prior to the accident, Ms. Buchignani testified that she had major surgery in September 2003 and a second surgery on her left hand in October 2003. She had been diagnosed with osteoporosis, arthritis, fibromyalgia, and Meniere's disease. Though she was prescribed glasses for driving and reading, she was not wearing any when she fell. She was on numerous medications. She also had a history of blackouts as recent as November 3, 2003.
After the completion of testimony, the trial court granted the City of Shreveport's motion for involuntary dismissal on the grounds that the City had neither actual nor constructive notice of the defect prior to the accident. The City's dismissal is not at issue.
The trial court ruled in favor of Ms. Buchignani against Sci-Port. The trial court found that the difference in elevation of one and one-half inches at the exact area of the steps created an unreasonable risk of harm that was not easily observable. However, the trial court also attributed thirty percent of the fault to Ms. Buchignani. The trial court noted that she was "medically fragile" and that she had a history of profound vision problems with uncorrected vision of 20/400. The trial court further noted that she was not wearing her glasses at the time of the accident and that she failed to take the precautions that someone with her vision problems should have taken. The trial court awarded damages in the amount of $50,000, reduced by her percentage of fault to $35,000. This appeal followed.

DISCUSSION
Sci-Port appeals the trial court's finding that the height variance at the expansion *1203 joint by the slab at the start of the steps presented an unreasonably dangerous condition, particularly to a prudent person exercising ordinary care. Sci-Port contends that the trial court erred in its analysis by not considering the utility of expansion joints. Sci-Port also appeals the trial court's assessment of only thirty percent of the fault to Ms. Buchignani. However, Ms. Buchignani answered the appeal to assert that the trial court erred in assessing her with fault in the accident and in not finding Sci-Port to be fully at fault. Thus, two issues are presented for review  whether the height variance at the expansion joint between the plaza and the concrete slab adjacent to the steps created an unreasonable risk of harm, and whether the trial court erred in its assessment of fault.
Unreasonable Risk of Harm
The determination of whether a defect presents an unreasonable risk of harm involves factual findings which differ in each case. Thus, there is no fixed or mechanical rule for determining whether a defect presents an unreasonable risk of harm. McAdams v. Willis Knighton Medical Center, 38,181 (La.App. 2d Cir.12/19/03), 862 So.2d 1186; Reitzell v. Pecanland Mall Associates, Ltd., 37,524 (La.App. 2d Cir.8/20/03), 852 So.2d 1229. The trier of fact determines whether a defect presents an unreasonable risk of harm and that determination is reviewed under the manifest error standard. Reed v. Wal-Mart Stores, Inc., 97-1174 (La.3/4/98), 708 So.2d 362.
The unreasonable risk of harm analysis requires the trier of fact to balance the gravity and risk of harm against individual and societal rights and obligations, the thing's social value and utility, and the cost and feasibility of repairing the defect. Reed v. Wal-Mart Stores, Inc., supra; Reitzell, supra. The accident history of the defect is also a pertinent consideration. Boyle v. Board of Supervisors, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080; Reed, supra. The question for the trier of fact is whether the social value and utility outweigh, and thus justify, the potential harm to others. Reed, supra.
The mere occurrence of an accident because of a defect does not establish that the defect is unreasonably dangerous. Rather, the vice or defect must present a dangerous condition that would be reasonably expected to cause injury to a prudent person exercising reasonable care under the circumstances. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Williams v. City of Baton Rouge, XXXX-XXXX (La.App. 1st Cir.3/28/03), 844 So.2d 360. As noted by the Louisiana Supreme Court:
It is common for the surfaces of streets, sidewalks, and parking lots to be irregular. It is not the duty of the party having garde of the same to eliminate all variations in elevations existing along the countless cracks, seams, joints and curbs. These surfaces are not required to be smooth and lacking in deviations, and indeed, such a requirement would be impossible to meet. Rather, a party may only be held liable for those defects which present an unreasonable risk of harm.
Reed, supra, 97-1174, p. 2; 708 So.2d at 363.
Sci-Port argues that the difference in elevation at the expansion joint did not create an unreasonable risk of harm. It notes the lack of prior accidents or complaints, the presence of handrails at the steps, the presence of a ramp as an alternative route, and Ms. Buchignani's medically fragile condition and poor vision as factors weighing against a finding of an unreasonable risk of harm. Also, Sci-Port *1204 argues that the trial court ignored the utility of expansion joints in making its determination. Sci-Port cites Reed, supra, and Williams v. Leonard Chabert Medical Center, 98-1029 (La.App. 1st Cir.9/26/99), 744 So.2d 206, writ denied, XXXX-XXXX (La.2/18/00), 754 So.2d 974, to support its argument.
In Reed, supra, the plaintiff tripped on an expansion joint between concrete blocks in a parking lot. There was a height difference of one-half inch to one-fourth inch along the joint. The trial court found the height variance to be an unreasonably dangerous condition, and the appellate court affirmed. In reversing the lower courts, the supreme court found the height variance at the joint to be minimal. The defect was in a high traffic area, and there had been no prior reported accidents. The court considered the social utility of paved parking lots and expansion joints, which allow concrete to expand and contract with hot and cold weather so as to avoid cracking or buckling. The court also considered the prohibitively high cost to both businesses and the public of repairing all such defects in parking lots and similar surfaces.
In Williams, supra, the plaintiff tripped at an expansion joint while walking along the curb of a roadway from a parking lot to the hospital. Her shoe came off and remained in the joint when she fell. The height variance at the joint was similar to that in Reed, supra. Although the trial court found the defect to be an unreasonably dangerous condition, the appellate court reversed. The appellate court noted that the trial court failed to consider either the lack of prior accidents or the utility of paved parking and expansion joints. The appellate court also found that the expansion joint was clearly visible to the plaintiff as shown by photographs. Considering the obviousness of the expansion joint, there was no reason for the hospital to have warned the plaintiff of the height differential. The court explained:
[W]e do not live in a perfect world. We cannot impose a duty on a landowner to have perfectly flawless premises. Sidewalks and parking lots are not always level, and individuals must assume some responsibility for their own safety. Everyday life presents risks which must be encountered and negotiated.
Williams, supra at 98-1029, p. 9, 744 So.2d at 211.
While both cases cited by Sci-Port are analogous to the present matter in that all involve an incident at an expansion joint, neither is dispositive. As explained, determining whether a defect presents an unreasonable risk of harm is a fact specific inquiry, and great deference is to be given to the trier of fact's determination. In its reasons for judgment, the trial court found that the defect in elevation involving a variance of one and one-half inches was not apparent or easily seen and that its presence right at the steps presented an unreasonable risk of harm. Even considering the clear utility of the expansion joint and the lack of prior accidents or complaints, we cannot say that the trial court erred in its finding.
The height difference of one and one-half inches at the joint was greater than that in either Reed or Williams. We place great significance on the location of the expansion joint at the start of the steps leading down to the parking lot. The presence of a height variance of up to one and one-half inches at a joint by the steps poses a much greater danger than height variances at joints on flat surfaces. A greater risk of harm exists when a height variance at an expansion joint causes a person to trip and fall down a flight of concrete steps than when a person falls only to the ground on a flat surface. We *1205 believe that this enhanced danger outweighs the fact that no prior accidents had been reported.
While we recognize the purpose served by expansion joints as explained in Reed, supra, and shown by evidence in this case, that factor does not outweigh the potential of harm posed by the defect at the top of a series of concrete steps. Moreover, we do not find the cost of repairing the defect to be prohibitive. Evidence shows that the defect was repaired by the City for under $2,000. Elimination of every variance at every expansion joint is not required as suggested in Reed, supra, because the dangerous nature of this defect was not due simply to the variance in height at the joint but was due to the defect's proximity to concrete steps, which created a particularly dangerous risk of harm.
Neither the presence of handrails nor the ramp as an alternative route make a difference in our analysis of whether the defect was unreasonably dangerous. The handrails may have been within reach upon stepping on the slab just in front of the steps, but they do not prevent a person from first tripping on the expansion joint and falling down the steps before being able to grasp the railing. Ms. Buchignani's decision to use the steps rather than the ramp is a factor more appropriately considered in assessing her comparative fault than in determining whether the defect presented an unreasonable risk of harm.
Landowners or custodians of property are not required to maintain "perfectly flawless premises," but they are required to guard against defects which pose an unreasonable risk of harm. Here, the height variance at the expansion joint where Ms. Buchignani tripped posed an unreasonable risk of harm. We find no manifest error in the trial court's judgment.
Allocation of Fault
Both Sci-Port and Ms. Buchignani complain that the trial court erred in assessing her with thirty percent comparative fault. Sci-Port argues that Ms. Buchignani did not exercise the reasonable care to be expected of someone with her various health problems and should bear the bulk of the fault for the accident. Sci-Port points out that she was not wearing glasses even though she had a history of profound vision problems. Sci-Port also points out that she did not hold the handrail, that she could have used the ramp, and that she could have had her sons assist her down the steps.
For her part, Ms. Buchignani contends that she did not need to wear glasses for walking and that she had no duty to see a defect that was not even easily noticeable. She further contends that she was conducting herself in her normal fashion, that she did not need or use glasses for walking, and that she was not dizzy or unstable at the time of the accident. She asserts that she should not be penalized for choosing the steps instead of the ramp.
In assessing the comparative fault of parties, various factors may influence the degree of fault assigned. These include whether the conduct resulted from inadvertence or involved an awareness of danger, how great a risk was created by the conduct, the significance of what was sought by the conduct, the superior or inferior capacity of the parties, and any extenuating circumstances which might require one to proceed in haste and without proper thought. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985).
The trier of fact is owed great deference in its allocation of fault and may not be reversed unless clearly wrong or manifestly *1206 erroneous. Hughes v. Scottsdale Ins. Co., 35,043 (La.App. 2d Cir.8/22/01), 793 So.2d 537.
In finding comparative fault on the part of Ms. Buchignani, the trial court described her as medically fragile with a history of profound vision problems. The record supports this description. The court concluded that Ms. Buchignani must bear some responsibility for not wearing glasses, for choosing to take the steps, and for not exercising caution as someone with her vision problems should. We agree. We also note that Ms. Buchignani had undergone surgery weeks prior to the accident and was wearing a cast on her left hand. She approached the steps where her unusable left hand was closest to the handrail, rather than taking a route which would enable her to grasp the rail with her right hand as soon as the rail was within reach. While there was no reason for Ms. Buchignani to be aware of the specific defect which caused the accident, she should have considered the general dangers posed by the irregularities inherent in concrete walkways and steps, such as joints, cracks, and other variations, in choosing her route and exercising caution in approaching the steps.
The record supports allocation of some fault to Ms. Buchignani, but it does not support allocation of the majority of the fault to her as urged by Sci-Port. Sci-Port had the duty to maintain its facilities. Harold E. Hunt, III, Sci-Port's operations assistant, had been aware of the defect since 2002. However, he did not notify anyone. Mr. Al-Najjar used the steps at Sci-Port but had never even noticed the defect. In the absence of such inadvertence, Sci-Port could have easily had the defect repaired by notifying the City of Shreveport as was done after the accident. Also, Sci-Port could have made the difference in elevation more visible by highlighting the area with paint, by posting warnings advising patrons to use the ramp or exercise caution in taking the steps, or by closing the steps until the repair was made. Clearly, Sci-Port had the superior capacity to find and correct the defect prior to any accident happening.
Both parties were at fault in the accident. While we may have allocated fault differently as trier of fact, we cannot say that the trial court abused its discretion in allocating thirty percent of the fault to Ms. Buchignani.

CONCLUSION
For the reasons set forth above, we affirm the trial court's judgment. Seventy percent of the appeal costs are assessed to Sci-Port and its insurer, and thirty percent are assessed to Ms. Buchignani.
AFFIRMED.