434 So.2d 605 (1983)
Maggie BUXTON, et al., Plaintiffs-Appellees,
v.
ALLSTATE INSURANCE COMPANY, Defendant-Appellant.
No. 83-99.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1983.
*606 Raggio, Cappel, Chozen & Berniard, G. Michael Bourgeois, Lake Charles, for defendant-appellant.
John P. Navarre, Oakdale, for plaintiffs-appellees.
Before DOMENGEAUX, GUIDRY and YELVERTON, JJ.
YELVERTON, Judge.
This is a wrongful death action brought by the four sisters of the deceased Ether Boultinghouse. Plaintiffs alleged that the condition of the steps to the house where the deceased lived caused her to slip and fall resulting in her death. Defendant, Allstate Insurance Company, the homeowner *607 insurer, appeals from a judgment of the trial court awarding three of the sisters $25,000 each for the wrongful death of their sister. We affirm.
Ether Boultinghouse lived with her sister and brother-in-law, Maggie and Hubbard Buxton, at the Buxton home in Oakdale, Louisiana, for the five and one half years preceding the accident. Ether rented an apartment within the Buxton home. The apartment consisted of a front room, a bedroom, a kitchen, and a bathroom. Her rent consisted of paying one-half the utility bill and approximately $75 per month. Ether cooked her own meals.
On December 16, 1980, Ether and the Buxtons went Christmas and grocery shopping in Alexandria. When they returned home the Buxtons entered the house with their packages. Ether followed carrying one bag in her right hand containing a package of sugar and some fruit. The steps leading into the home consisted of three risers. When she reached for the screen door her foot slipped on the step and she fell into the yard. She was taken immediately to St. Francis Cabrini Hospital by ambulance. She was diagnosed as having a fractured hip and underwent surgery. On December 31, 1980, she returned home. She died suddenly three days later of a pulmonary embolus which the medical testimony attributed to the fall. She was 86 years old.
PlaintiffsMaggie Buxton, Daisy Sonnier, Beatrice Fuller, and Marjorie Ferrich, sisters of the deceasedfiled suit against the Buxtons' homeowner insurer, Allstate. Allstate answered denying all allegations and pleading the affirmative defense that the deceased assumed the risk of her injuries. Following trial judgment was rendered awarding each sister $25,000 for the wrongful death of Ether. In his reasons for judgment the trial court found the steps to be defective and a cause of the accident, thereby creating liability on the part of the defendant. A joint motion to correct the judgment was made and granted eliminating Maggie Buxton from the judgment since she was an insured under the home-owner's insurance policy and thus excluded from recovery of damages.
Allstate's appeal raises the following issues: 1) Were the steps defective? 2) Were the steps a cause of the accident? 3) Did Ether Boultinghouse assume the risk of injury? 4) Were the awards excessive? and 5) Was the deceased an omnibus insured excluding recovery under the terms of the policy? We will now address each issue in the order presented.
Were the Steps Defective?
Under La.Civil Code art. 2315 a person may be held liable for any damage caused by his negligence and/or fault. Strict liability is imposed upon an owner-lessor of premises for injuries sustained because the premises are defective. Wunstell v. Crochet, 325 So.2d 727 (La.App. 4th Cir. 1976). Fault in this instance is analogized from the conduct required of the owner-lessor by articles 2322 and/or 2695, and responsibility for the fault-caused damage attaches under article 2315. Wunstell, supra; and Keller v. Kelly, 378 So.2d 1006 (La.App. 4th Cir.1979), writ denied 380 So.2d 624 (La.1980).
La.Civil Code art. 2695 reads as follows:
Art. 2695. The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
In the similar case of Wilson v. Virgademo, 258 So.2d 572 (La.App. 4th Cir.1972), the plaintiff-tenant emerged from her apartment with a pot of soup. She stepped onto the top riser of four cement steps and placed the soup down in order to close the door. While turning to descend before picking up the pot of soup, the step on which she was standing tilted, throwing her off balance and causing her to fall on the sidewalk. In affirming the jury award the *608 appellate court found liability on the part of the landlord and his insurer under article 2695 and stated:
It is beyond dispute that LSA-C.C. art. 2695 places upon the landlord the primary obligation of keeping his premises in repair and that he is liable for injuries due to accidents resulting from defects which can be reasonably expected to cause injury to persons using ordinary care. Anslem v. Travelers Insurance Company, 192 So.2d 599 (La.App. 3d Cir. 1966). Furthermore, it is well-settled that this liability of the landlord attaches whether or not he had actual knowledge of the defective condition of the premises. Boutte v. New Orleans Terminal Co., 139 La. 945, 72 So. 513 (1916); Thompson v. Moran, 19 La.App. 343, 140 So. 291 (Orl. 1932). The condition of the steps in the instant case is clearly the type of defect that is contemplated by LSA-C.C. art. 2695.

(emphasis added)
In the present case the condition of the steps is also clearly the type of defect that is contemplated by article 2695. Thilo Steinschulte, an architect, testified that the steps consisted of three risers leading into the residence. He found the steps were in a delapidated condition with three obvious defects: 1) the risers were of different heights; 2) the riser treads were of different width or depths; and 3) the surface was deteriorated. The steps were originally built of brick but had been covered in cement. The treads were at a slant instead of level. The two top corners of the wing wall were loose.
Mr. Buxton, the owner-landlord, testified that he poured concrete over the bricks approximately 10-12 years ago because his grandchildren had broken several of the bricks with a hammer. He stated that the concrete had started to crumble and break. His wife testified that the top was rounded and sloping to the right.
Considering the above testimony we agree with the trial court's finding that the steps were defective.
Were the Steps a Cause of the Accident?
The next issue for our consideration is whether the trial court erred in determining whether the condition of the steps caused the accident.
There were no witnesses to the accident. Three sisters of the deceased testified by deposition that they had talked with the deceased in the hospital after the accident. Beatrice Fuller and Daisy Allen stated that Mrs. Boultinghouse had informed them that as she reached for the door her foot slipped causing her to fall into the yard. Dorothy Ferrill testified as to their conversation as follows:
"Q What conversation did ya'll have about the accident, do you recall?
"A Yes. I remember her telling us about her falling because she had been by my house that day that she went to Alexandria and then they called me that afternoon and said that she had fell at the door step, on the door step and broke her leg. And we went over there to see her and I asked her, I said, `Ether, how did this happen?' She said, `Well, I had some packages that I had done my shopping,' and said, `We were at home and as I was going up the steps and I reached to get the screen door to open it,' and said, `My foot slipped on that step,' and said, `The next thing I knew I was out in the yard.' She had fell."
Mr. Steinschulte, the expert for the plaintiffs, stated that the hazardous condition of the steps was conducive to an accident making one very likely to happen, even to a person paying attention to the condition. He opined that the condition of the steps definitely could have contributed to or caused the accident.
Mr. Buxton testified that it had been raining on the day of the accident. However, further testimony revealed that at the time of the accident the steps were not wet.
The testimony of Dr. Herbert Nesom, a physician, revealed that the deceased died of a pulmonary embolus which is a frequent *609 complication of an elderly person after undergoing hip surgery. The deceased had undergone hip surgery as a result of the fall.
It is clear under the jurisprudence that causation may be proved by circumstantial evidence and that evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Lombard v. Sewerage & Water Board of New Orleans, 284 So.2d 905 (La. 1973); and South Central Bell Tel. Co. v. Hartford Acc., 385 So.2d 830 (La.App. 1st Cir.1980), writ denied 386 So.2d 356 (La. 1980).
This court, based on the above testimony, finds a sufficient degree of certainty in the evidence to conclude that the death of Ether Boultinghouse occurred as a result of her slipping on the defective condition of the steps.
Did the Deceased Assume the Risk?
Next the defendant argues that the plaintiffs should be barred from recovery by the defense of assumption of the risk where the deceased was fully aware of the condition of the steps yet voluntarily proceeded to encounter the risk.
In Wunstell v. Crochet, supra, the court concluded that a tenant's recovery would be barred by the defense of assumption of the risk where the plaintiff was fully aware of the risk created and knew her action could produce a disastrous result, yet voluntarily proceeded to encounter the risk. In that case the plaintiff acted in such a manner as to invite injury by voluntarily and unreasonably exposing her child to excessive heat from a furnace, a risk which was known by her from previous experience to result when she left the air conditioning unit on in the bedroom with all the doors in that room closed. At 325 So.2d 731, in footnote 5, the court distinguished the facts of its case, as follows:
5. We distinguish this case from one, for example, in which a slum landlord provides only a rickety stairway as a means of entrance and the impoverished tenant is injured when the obviously unsafe stairway gives way. In such a case the tenant, although aware of the risk of injury, does not voluntarily consent to subject himself to this risk, but virtually has no freedom of choice, since this is his only means of entrance.
In Wilson v. Virgademo, supra, the step leading to her apartment on which the plaintiff-tenant was standing tilted causing the plaintiff to fall. The evidence revealed that the defective condition of the steps was obvious and that plaintiff had knowledge of the condition. In that case the court concluded that plaintiff's continued use of the steps despite her knowledge of the condition was not so unreasonable as to bar her recovery since the court did not find the condition of the steps to be so "apparently and imminently dangerous" that the plaintiff might not safely use the steps with an exercise of care. In that case plaintiff had fallen from the steps on a prior occasion.
In the present case the deceased used the steps to the house during the last five and one half years of her life. She must have been aware of their delapidated condition. However, we find that her continued use of the steps despite her knowledge of their condition does not bar the plaintiffs from recovery for two reasons. First, Mrs. Buxton testified that the deceased had to use the steps to come and go from the house. Since there was no evidence presented to suggest that the deceased could have used a safer alternative means of ingress and egress to the house, the deceased did not voluntarily consent to subject herself to the risk since this was her only means of entrance. Second, the evidence does not suggest that the condition of the steps was so "apparently and imminently dangerous" that the deceased might not use the steps with the exercise of reasonable care. We find no evidence to suggest the deceased failed to exercise reasonable care in ascending the steps.
*610 Were the Awards Excessive?
Defendant argues also that the $25,000 award to each of the three sisters was excessive. We disagree.
Under article 2315 the brothers and sisters of the deceased who leaves no spouse, child or parent surviving, may recover damages which they sustain through the wrongful death of their sibling as well as recover damages caused by the offense to the deceased. In calculating the award in such a case the deceased's pain and suffering prior to the death as well as each sibling's loss of companionship, love and affection is considered. See LeCompte v. Soileau, 258 So.2d 198 (La.App. 4th Cir. 1972), writ denied 259 So.2d 915 (La.1972).
The facts in the present case reveal that the deceased fractured her hip on December 16, 1980, underwent surgery, and died on January 3, 1981. It is obvious that the injury caused the deceased pain and suffering before her death. Also immediately before her death the deceased kept stating that she could not breathe, declared she was suffocating, and knew she was dying. The three sisters testified that they were practically raised by Mrs. Boultinghouse, their older sister, and considered her like a mother. Each sister was extremely close to the deceased.
Under these facts we cannot say that the $25,000 award to each sister was excessive. Was the Deceased an Omnibus Insured Excluding Recovery Under the Terms of the Policy?
The defendant finally argues that under the terms of their insurance policy Mrs. Boultinghouse is an omnibus insured since she was a relative living in the Buxton household.
The pertinent language in the policy reads as follows:
"`Insured Person'means you and, if a resident of your household, any relative and any dependent in your care."
. . . . .
"Losses We Cover
"We will pay all sums arising from the same loss which an insured person becomes legally obligated to pay as damages because of bodily injury or property damage covered by this part of the policy."
. . . . .
"ExclusionsLosses We Do Not Cover"
. . . . .
"We do not cover bodily injury to an insured person or property damage to property owned by an insured person."
There is no question that the deceased was a relative of the Buxtons. The only issue is whether she was a resident of their household.
In the analogous case of Hernandez v. Comco Ins. Co., 357 So.2d 1368 (La.App. 4th Cir.1978), writ denied 359 So.2d 1305 (La. 1978) the court had to determine whether a son-in-law was a relative within the household of the insured for purposes of providing coverage for the son-in-law's negligent acts. In that case the son-in-law and his wife lived in a separate dwelling behind the insured's house. They paid their own utilities, purchased their own groceries, cooked their own meals, and did their own laundry. In effect they had a separate and distinct existence from their in-laws. In determining the son-in-law was not a member of the household of the insured the court stated:
The problem of defining the word "household" has been faced by innumerable courts with no clear or easy resolution. See 19A Words and Phrases Household (West 1970). Ultimately, whether a person is a member of a given household is a question of fact, to be determined after consideration of all the circumstances.
Webster's Third New International Dictionary (1971) defines "household" as "those who dwell under the same roof and compose a family; a domestic establishment; specifically, a social unit comprised of those living together in the same dwelling place." Black's Law Dictionary (4th ed. 1957) defines it as "a family living together; those who dwell *611 under the same roof and compose a family." However, living technically "under the same roof" has been found not to be essential. See Taylor v. State Farm Mutual Auto Ins. Co., 248 La. 246, 178 So.2d 238 (La.1965); Vinet v. Hano, 281 So.2d 183 (La.App. 4th Cir.1973), writ refused October 12, 1973; Fidelity and Casualty Company of New York v. Jackson, 194 F.Supp. 431 (E.D.N.C.1961) and citations therein.
Perhaps the most appropriate definition of "household" was set forth by the court in Leteff v. Maryland Casualty Co., 91 So.2d 123 (La.App. 1st Cir.1956):
"Whether the term `household' or `family' is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a `collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness.'" 91 So.2d at 130.
The pattern which emerges from the myriad of decisions considering the term "household" seems to be an emphasis on dwelling as a family under one head. Here there existed two distinct families, dwelling apart. The testimony in the record discloses that all parties involved considered themselves as two independent family units. Clearly, Mr. Pellegrini was not the head of Lonnie Hernandez' household, nor were Lonnie Hernandez and his wife part of the Pellegrini household. This is the same conclusion reached by the trial court and we believe there is substantial evidence in the record to support his conclusion, which will not be upset. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
In the present case we also find, as evidently the trial court found, that the policy provisions did not exclude the plaintiffs from recovery. Here the deceased lived in a separate area of the house. She had her own kitchen facilities, bathroom, living room and bathroom. She paid rent to the Buxtons. The testimony of the Buxtons revealed she did her own cooking and was extremely independent. We conclude that the deceased was not a resident of the Buxton household, but the head of her own household, and not an omnibus insured under the terms of the policy.
For the reasons assigned the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.