959 So.2d 529 (2007)
Emma Jean AMBROSE, Individually and as Guardian and Tutrix for her Major Son, Kenneth Ambrose, and Natalie Ambrose, Individually
v.
MS. McGee McLANEY, Widow of William J. McLaney and ABC Insurance Company.
No. 2006-CA-1181.
Court of Appeal of Louisiana, Fourth Circuit.
May 16, 2007.
*531 Louis Merhige, Metairie, LA, for Plaintiffs/Appellees.
John D. Fitzmorris, Jr., New Orleans, LA, for Defendant/Appellant McGee McLaney.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE, Judge ROLAND L. BELSOME).
PATRICIA RIVET MURRAY, Judge.
This is a premises liability case by a tenant against her landlord. The tenant, Natalie Ambrose,[1] brought this claim against her landlord, Magdalene McLaney,[2] to recover for the personal injuries she sustained when she fell down the exterior stairs of the leased premises. From the judgment awarding Ms. Ambrose $66,697.33 in damages, Ms. McLaney appeals. For the reasons that follow, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
In February 2002, Ms. Ambrose and several family membersher mother, Emma Jean Ambrose; her adult autistic brother, Kenneth Ambrose; and her foster child, Eric Cartermoved into a two-family duplex located at 3723 Diane Place in Metairie, Louisiana. Ms. Ambrose and her mother rented the upstairs unit of the duplex from its owner, Ms. McLaney. Ms. McLaney's niece, Susan Ballard, rented the downstairs unit.
Ms. Ambrose's initial lease was for a six-month term commencing in February 2002 and ending July 2002; thereafter, she leased the upstairs unit on a month-to-month basis until February 2003. An exterior straight flight of stairs provided the sole means of access to the upstairs unit. At the inception of the lease, the stairs were in a dilapidated condition. The stairs were metal, but most of them had a plywood-cover nailed onto them. Some of the plywood-covers were loose.
On the morning of Sunday, December 29, 2002, Ms. Ambrose fell while descending the stairs. According to Ms. Ambrose, a plywood cover on one of the first couple of stairs from the top came loose and caused her to fall.[3] She landed at the bottom of the stairs on some flagstones. As she was tumbling down the stairs, she hit her head and was knocked unconscious for about fifteen minutes.
Ms. Ambrose's mother witnessed the accident from the porch outside their upstairs unit. At the time of the accident, Ms. Ambrose and her mother were engaged in a conversation. After witnessing the accident, Ms. Ambrose's mother called 911 and brought a towel to wipe her *532 daughter's face. Ms. Ambrose was taken by ambulance to the hospital where she was treated and released that evening. This suit followed.
In her petition, Ms. Ambrose alleges that the leased premises were unreasonably dangerous. She also alleges that her injuries as a result of the accident included "a head concussion with probable disc herniations, numerous strains, sprains, contusions and lacerations to her body."
On March 8, 2006, a bench trial was held in this matter. At trial, three witnesses testified: Ms. Ambrose; her mother, Emma Jean Ambrose; and Ms. McLaney. The evidence introduced included photographs taken a few days after the accident and the videotape taken about a month after the accident. The photographs depicted the stairs and the bruises on Ms. Ambrose's face and legs. The videotape depicted the leased premises. The medical evidence introduced included the depositions of the three doctors who treated Ms. Ambrose: Dr. Stewart Altman, a general surgeon; Dr. Morteza Shamsnia, a neurologist; and Dr. Jacques Whitecloud, a physiatrist.[4]
On May 1, 2006, the trial court rendered judgment in Ms. Ambrose's favor. As noted, she was awarded damages totaling $66,697.33.[5] The damage award was broken down as follows:

 General Damages $40,000.00
 Lost Wages 3,256.30
 Past Medical Expenses 17,607.20
 Prescription Drug Costs 257.83
 Care Giver Services 576.00
 Past and Future Physical
 Pain and Suffering 5,000.00
 __________
 Total Damages $66,697.33

From that judgment, Ms. McLaney appeals asserting six assignments of error. Two errors relate to liability; one error relates to comparative fault; one error relates to the quantum; and two errors relate to evidentiary issues. We separately address each category.

LIABILTY
The governing provisions in this premises liability case are La. C.C. arts. 2317.1, which provides for liability for things, and 2322, which provides for liability for buildings.[6] As a result of the 1996 amendments, the former strict liability causes of action provided for under these articles are now negligence causes of action. *533 Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 14-6 (1996)("Maraist & Galligan"). A plaintiff who alleges a negligence cause of action under these former strict liability provisions must prove the following three elements: (i) that the defendant knew or should have known of the vice or defect; (ii) that the damage could have been prevented by the exercise of reasonable care; and (iii) that the defendant failed to exercise reasonable care. Greenhouse v. C.F. Kenner Associates Ltd. Partnership, 98-0496, p. 5 (La.App. 4 Cir. 11/10/98), 723 So.2d 1004, 1007. Under Article 2322, the plaintiff must also prove "either a building or its `appurtenance' and a `ruin' that presents an unreasonable risk of harm caused by neglect to repair or a vice in the original construction." Maraist & Galligan, supra at § 14-6.
Although the trial court in this case did not provide written reasons for judgment, the trial court's finding of liability on the part of Ms. McLaney apparently was based on its conclusion that the stairs on which Ms. Ambrose fell were defective and presented an unreasonable risk of harm. Ms. McLaney argues the trial court's finding of liability is erroneous for two reasons.
First, Ms. McLaney argues, based on Ms. Ambrose's testimony, that the defect in this case should be narrowly defined as the first couple of stairs from the top as opposed to the entire staircase. Given that definition, Ms. McLaney contends that the record contains no evidence to support a finding that there was a defect.[7] According to Ms. McLaney, Ms. Ambrose's testimony that she fell as a result of a loose board on the first couple of stairs is contradicted by the photographs that were taken a few days after the accident. The photographs, Ms. McLaney emphasizes, do not depict a loose board or defect on the first couple of stairs; rather, the photographs depict the plywood on those stairs to be firmly in place. She further emphasizes Ms. Ambrose's testimony that the photographs depict the stairs in the same condition as they were at the time of the accident.
The gist of Ms. McLaney's first argument is that this case falls within the exception to the manifest error rule "where documents or objective evidence so contradict the witness's story . . . that a reasonable factfinder would not credit the witness's story." Cuevas v. City of New Orleans, 99-2542, p. 3 (La.App. 4 Cir. 6/21/00), 769 So.2d 82, 84-85 (citing Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989)). Her reliance on that exception is misplaced. Contrary to Ms. McLaney's contention, the photographs of the stairs are not dispositive. As Ms. Ambrose correctly pointed out in her testimony, a photograph cannot definitively depict if a plywood board cover on a stair is loose.
Ms. Ambrose, corroborated by her mother, testified that the cause of her fall was a loose board on one of the first couple of stairs.[8] According to Ms. Ambrose, there was a variation in distance between the stair treads, and both the plywood covers and the metal stairs had holes in them. Ms. Ambrose testified that her common practice was to "dance around the holes." She also kept a pair of slippers *534 next to the stairs to wear when she wore high heel shoes so that her heels would not get stuck in the holes. Ms. Ambrose and her mother both testified that they complained to Ms. McLaney and to her niece, Ms. Ballard, about the poor condition of the stairs several times. Ms. Ambrose testified that she complained not only when they first moved into the unit, but also when she paid the rent.
Ms. McLaney, who was eighty-five years old at the time of the trial, admitted in her testimony that Ms. Ambrose complained about the stairs at the inception of the lease. She further admitted that she informed Ms. Ambrose that she was going to repair the stairs, warned her to be careful when using the stairs, and admonished her to use the handrail. She still further admitted that the boards on some of the stairs were loose and indicated that this was the reason the stairs needed to be repaired. Despite her knowledge of the condition of the stairs, Ms. McLaney testified that she did not repair the stairs until the year after the accident occurred. Indeed, she testified that the stairs were in the same condition when she rented the unit to Ms. Ambrose as they were on the day of the accident.[9]
Given the above testimony regarding the condition of the stairs coupled with the photographs and videotape depicting the dilapidated condition of the stairs, the trial court's apparent finding that the stairs were defective is not manifestly erroneous.
Ms. McLaney's second argument is that under the facts of this case she had no duty. In support, Ms. McLaney cites the jurisprudence holding that "the duty which a landowner owes to persons entering his property is governed by a standard of reasonableness, and that a potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous." Socorro v. City of New Orleans, 579 So.2d 931, 941 (La.1991). She argues that this is just such a case in which the circumstances demonstrate that she owed no duty to Ms. Ambrose.
Ms. McLaney's second argument apparently is based on the "open and obvious" defense. Explaining the "open and obvious" defense, a commentator states:
Pre-1996, a court might have refused to apply strict liability because the risk at issue was "open and obvious." The same rule applies in negligence cases. While the "open and obvious" argument suggests a disguised application of contributory negligence or assumption of the risk, when the risk is open and obvious to everyone, the probability of injury is low and the risk may be outweighed by the thing's utility. Consequently, when the risk is open and obvious, the thing may not be unreasonably dangerous, or, after the amendments, the defendant may not have failed to exercise reasonable care.
Maraist & Galligan, supra at § 14-3.[10] Thus, the open and obvious nature of the defect is merely another factor to be *535 weighed in the risk-utility balance utilized to determine if an unreasonable risk of harm exists. Stated otherwise, "[t]he degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous." Hutchinson v. Knights of Columbus, Council No. 5747, 03-1533, p. 9 (La.2/20/04), 866 So.2d 228, 235.[11]
Penton v. Schuster, 98-1068 (La.App. 5 Cir. 3/30/99), 732 So.2d 597, which Ms. McLaney relies upon, illustrates the uniformly held principle that "[w]here a risk of harm is obvious, universally known and easily avoidable, the risk is not unreasonable dangerous." Durmon v. Billings, 38,514, p. 8 (La.App. 2 Cir. 5/12/04), 873 So.2d 872, 877 (citing Henshaw v. Audubon Park Comm'n, 605 So.2d 640 (La.App. 4th Cir. 1992), and Butzman v. Louisiana Power and Light Co., 96-2073 (La.App. 4 Cir. 4/30/97), 694 So.2d 514).
In Penton, the plaintiff-tenant sued his landlord to recover for the injuries he sustained when he fell on loose bathroom floor tiles in his leased apartment. Affirming the trial court's finding that the tenant was 100% at fault, the court found the loose tiles were an obvious defect that was well known to the tenant. The court implicitly found the defect was easily avoidable, and explicitly found the tenant failed to exercise reasonable care for his own safety. The court emphasized that the tenant repeatedly failed to comply with the landlord's request to remove at least one large dog from the apartment so that the landlord's contractor could enter the premises to repair the loose tiles.
Ms. McLaney's reliance on the Penton case is misplaced. Although the risk of harm in this case presented by the defectthe dilapidated stairscould be labeled obvious, it was not easily avoidable by Ms. Ambrose, an upstairs tenant with no other means of access to her apartment. See Davis v. Allstate Ins. Co., 346 So.2d 1111, 1112 (La.App. 4th Cir.1977)(holding that a landlord has a duty to an upstairs tenant "to furnish a stairway which is reasonably safe for its intended use.")[12] Moreover, unlike in Penton, no attempt to repair was made by the landlord. Despite Ms. Ambrose's complaints, Ms. McLaney failed to make any repairs to the stairs until after the accident. We further note, as discussed elsewhere, that the handrail to the stairs apparently was broken at the time of the accident, which was the reason Ms. Ambrose gave for not using it.
Ms. McLaney also contends that Ms. Ambrose's familiarity with the steps constitutes objective evidence establishing that the first couple of steps did not present an unreasonable risk of harm. Based on Ms. Ambrose's testimony that she went up and down the stairs twice a day for almost a year before the accident, Ms. McLaney calculates that Ms Ambrose had traversed the stairs about 700 times without incident before the accident. Ms. Ambrose's family members likewise traversed *536 the stairs without incident.[13] "The determination of what the plaintiff knew regarding the risk of injury is made after fault on the part of the defendant has been established, and is governed by the comparative fault principles." Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1136 (La.1988). Thus, Ms. Ambrose's familiarity with the steps is relevant on the issue of whether she should be found to have comparative fault, which is discussed next.
The trial court's finding of whether a defect creates an unreasonable risk of harm is subject to a manifest error standard of review. Reed v. Wal-Mart Stores, Inc., 97,1174, p. 5 (La.3/4/98), 708 So.2d 362, 365.[14] Unlike in Penton, the trial court in this case found the defectthe dilapidated stairspresented an unreasonable risk of harm. Given the particular circumstances presented in this case, we cannot say the trial court's finding that the stairs presented an unreasonable risk of harm is manifestly erroneous.

COMPARATIVE FAULT
Whether comparative fault applies in a given case is a factual determination governed by the manifest error standard of review; hence, "[o]nly if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages." Maldonado v. Louisiana Superdome Comm'n, 95-2490, p. 10 (La.App. 4 Cir. 1/22/97), 687 So.2d 1087, 1093 (citing Clement v. Frey, 95-1119, pp. 7-8 (La.1/16/96), 666 So.2d 607, 610-11).[15]
Ms. McLaney contends that the trial court erred in failing to allocate at least 50% of the fault to Ms. Ambrose. She also contends that this case is analogous to Griffin v. Foti, 523 So.2d 935 (La.App. 4th Cir.1988), in which the plaintiff, a parish prisoner who slipped and fell in the prison shower, was found to be 50% at fault because of his familiarity with the defect the leaking shower wall. As in Griffin, Ms. McLaney contends that Ms. Ambrose should be at least 50% at fault for the following reasons: (i) she knew of the condition of the stairs, (ii) she knew that the plywood cover had come off other stairs; (iii) she knew there was a potential for other pieces of plywood cover coming loose; (iv) she knew there was a handrail, but eschewed using it; and (v) she had negotiated the steps for almost a year without incidentabout 700 times.
Although Ms. McLaney emphasizes Ms. Ambrose's failure to use the available handrail, Ms. Ambrose, corroborated by *537 her mother, testified that the handrail was loose. Ms. Ambrose and her mother both testified that they had complained to Ms. McLaney regarding the loose handrail, but it had not been repaired. At trial, Ms. McLaney testified that she repaired the handrail shortly after the Ambrose family moved into the unit, but she could not remember exactly when she fixed it. Nor could she produce any tax records or other receipts to prove she fixed it. Nor did she include the repair of the handrail in her response to the interrogatory asking what items she had repaired in the duplex in 2001 and 2002.[16] Given the conflicting testimony on this issue, the trial court's implicit finding of no fault on Ms. Ambrose's part for failure to use the handrail is not manifestly erroneous.
As noted, Ms. McLaney also relies on Ms. Ambrose's familiarity with the stairs as establishing comparative fault on her part. Ms. Ambrose acknowledges her familiarity with the condition of the stairs, but contends that the trial court did not err in failing to find her at fault because the stairs were her sole means of access to her apartment. We agree.
The jurisprudence holds that when, as here, a property owner leaves its tenant no way to enter or leave the property except for defective stairs, the tenant is not negligent if the tenant falls on the stairs. An oft-cited example of this jurisprudential rule is provided by former Justice (then Judge) Lemmon in Wunstell v. Crochet, 325 So.2d 727, 731 (La.App. 4th Cir.1976); to-wit: "a slum landlord [who] provides only a rickety stairway as a means of entrance and the impoverished tenant is injured when the obviously unsafe stairway gives way. In such a case the tenant, although aware of the risk of injury, does not voluntarily consent to subject himself to this risk, but virtually has no freedom of choice, since this is his only means of entrance." Id. See also Jackson v. Tyson, 526 So.2d 398, 402 (La.App. 4th Cir.1988); Buxton v. Allstate Ins. Co., 434 So.2d 605, 609 (La.App. 3d Cir.1983); Wilson v. Virgademo, 258 So.2d 572, 575 (La. App. 4th Cir.1972). Based on this line of jurisprudence, we find Ms. McLaney's reliance on Griffin, supra, (and, as noted earlier, Penton, supra) is misplaced. Indeed, in Griffin, one of the factors we relied on in finding the plaintiff-prisoner 50 at fault was that he "could have taken the simple precaution of avoiding the wet area." Griffin, 523 So.2d at 941. Such is not the case here. The stairs were Ms. Ambrose's sole means of access to her upstairs unit.
Nor was any evidence presented to indicate that Ms. Ambrose was not being careful in descending the stairs on the morning of the accident. At the time of the accident, Ms. Ambrose was on her way to work. She testified that she was not in a rush that morning. Although we might have allocated some fault to Ms. Ambrose given her familiarity with the condition of the stairs, we cannot say the trial court's failure to allocate any fault to Ms. Ambrose was manifestly erroneous.

DAMAGES
When the trier of fact (in this case, the trial judge) has made a general damage award and the defendant is contending *538 that award is excessive, the abuse of discretion standard of appellate review applies. Dixon v. Travelers Ins. Co., 02-1364, p. 9 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 484-85.[17] The abuse of discretion standard is difficult to express and necessarily is "non-specific." Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. The jurisprudential theme that has emerged is that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). An appellate court's initial inquiry in reviewing a general damage award is whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the discretion vested in the trier of fact (here the trial judge). Youn, 623 So.2d at 1260.
In this case, Ms. McLaney contends that the trial court's award of $40,000 in general damages is excessive.[18] Ms. McLaney argues that Ms. Ambrose should be bound by her own division of her injuries between the December 29, 2002 accident on the stairs and a subsequent automobile accident that she was involved in on May 19, 2003. Based on Ms. Ambrose's deposition testimony in the unrelated litigation involving the automobile accident, Ms. McLaney contends that by the date of the automobile accident, which was five and a half months after the accident on the stairs, Ms. Ambrose was only complaining about the injury to her knees. Particularly, her testimony was that "the only complaint I had at that time was that my legs were really hurting, and I was in physical therapy for my legs." It follows, Ms. McLaney contends, that any injuries Ms. Ambrose reported thereafter should be related solely to the automobile accident. She thus contends that this case involves only soft tissue injuries that were resolved after five and one half months of episodic treatment and that the award of $40,000 is clearly an abuse of discretion. She suggests an award in the amount of $5,000 (reduced for comparative fault) would be reasonable.
Ms. Ambrose testified that on the day of the accident on the stairs she was treated and released at East Jefferson Hospital. At the hospital, a CT scan and x-rays were performed, and medication was prescribed. Three days later, on December 31, 2002, she first presented at Dr. Altman's office with complaints of pain in the neck, back, arms, knees, and ankles.
Between December 31, 2002 and April 9, 2003, Ms. Ambrose was seen by either Dr. Altman or his associate about a dozen times. At the initial December 31st visit, Ms. Ambrose related that on December 29, 2002, she was descending a flight of stairs at her apartment house when some plywood came off the third or fourth step, causing her to fall down the steps. She was unconscious for about fifteen minutes and immediately thereafter experienced *539 pain in the neck, back, and legs. Dr. Altman testified that his associate's notes from the initial visit indicate that his initial impression was "a cervical strain, thoracic sprain, lumbar sprain, bilateral arm contusion, bilateral knee contusion, bilateral ankle strain, [and] bilateral shoulder strain." Dr. Altman added that the initial impression also probably should have included "a cerebral concussion, by history." He also noted that she gave a history of no notable prior injuries or illnesses. At the initial visit, Ms. Ambrose was placed on disability from her job as an account manager for two weeks, prescribed medication, and advised to begin physical therapy with a medical technician.
On January 14, 2003, Ms. Ambrose was seen again at Dr. Altman's office. She related that she had fallen down the steps the day before and that her pain had increased. On that visit, she was given a slip for a handicapped license and continued on disability from her job for three more weeks.
On February 4, 2003, Ms. Ambrose was seen again at Dr. Altman's office and reported no improvement. She also reported that she was having severe headaches and blurred vision. On that visit, she was referred to a registered physical therapist for therapy. On February 25, 2003, she began seeing the therapist. She reported to the therapist that she had "pain everywhere," that her injuries stemmed from her falling down thirteen steps when the plywood board came off the stairs, and that she had fallen twice since then.
On March 19, 2003, Dr. Altman saw Ms. Ambrose. On this visit, she complained that her knees were giving out and she had paresthesiasabnormalities of sensations (in this case, pins and needles in both her hands). Dr. Altman discontinued the physical therapy until Ms. Ambrose could be seen by an orthopedist for the persistent pains in her neck, back, knees, and ankles. He also ordered MRIs of her neck, back, and knees.
On April 2, 2003, the MRIs were performed. The MRIs of the neck and back (lumbar and cervical spine) were basically normal; however, there was slight straightening of the cervical spine, which could be attributable to muscle spasm. The MRI of the right knee showed possible inflammatory changes, a small amount of fluid, and an abnormality in the femur. The MRI of the left knee showed some free fluid, a suggestion of tendonitis or bursitis involving the tendon in the knee, and some cellulitis or inflammation. The latter conditions of the left knee, Dr. Altman opined, more probably than not could be related to the accident.
On April 9, 2003, Ms. Ambrose was seen for the last time at Dr. Altman's office. On the final visit, Ms. Ambrose was still reporting neck, low back, and knee pains and still having problems sleeping. She was prescribed medication and continued on disability from her job for three more weeks. Dr. Altman's explanation as to what was causing Ms. Ambrose to have continuing pain was that:
[S]he has tears of muscles in the neck and back. It's possible that she bruised some nerves in the neck or the back that are producing the abnormalities that she has, the paresthesias. It's possible that just the swollen muscles are putting pressure on the nerves and you don't see anything on the MRI. So definitely sprains of everything. . . .
Because of the paresthesias that she was experiencing, Dr. Altman referred Ms. Ambrose to Dr. Shamsnia, a neurologist, for an EMG and nerve condition studies.
On May 8, 2003, Dr. Shamsnia first saw Ms. Ambrose. At that time, she reported that she had fallen down stairs in December *540 2002 and had trauma to her head and loss of consciousness for fifteen minutes. Ms. Ambrose's main complaints were low-back pain, non-specific pain in the legs, sleep problems, and memory concentration problems. She also complained of difficulty walking, and she was using a cane for ambulation. Ms. Ambrose related to him that she had been in excellent health before the December 2002 accident on the stairs and had no prior injuries or accidents. Dr. Shamsnia's initial impression was "posttraumatic headaches, neck pain and low-back pain, insomnia, [and] pain in the limbs." He suggested that she undergo multiple tests, including an EEG. The EEG was performed that same day and showed left abnormal C7 radiculopathy.[19]
On May 19, 2003, Ms. Ambrose had her first follow up visit with Dr. Shamsnia. She related that she had been involved in an automobile accident that day. The car she was driving was rear-ended, and she had increased neck pain as a result of that accident. Dr. Shamsnia testified that she had spasm in the neck area, which he related to the automobile accident, but otherwise there were no changes in her condition. He refilled her prescriptions and requested she provide him with the results of the April 2003 MRIs. On that date, he also completed the attending physician statement on a disability supplemental claim form for her disability insurance. In so doing, Dr. Shamsnia testified that he did not separate her injuries between the accident on the stairs and the automobile accident. He explained that "[s]he had multiple complaints from her first visit. I think her accident of May 19th has just exacerbated her neck pain, from what I have in my chart, nothing more than that. So I think if the May 19 [accident] had anything to do with it, it would be a very minor component." Dr. Shamsnia described Ms. Ambrose as cooperative and sincere, and he did not believe she was faking or malingering.
On June 2, 2003, Dr. Shamsnia last saw Ms. Ambrose. She had new complaints that day of left knee pain, left thigh pain, and muscle cramps in both legs. Based on her records from April 2003, when she had MRIs taken of her neck, lower back, and knees, Dr. Shamsnia testified that Ms. Ambrose "must have had some complaints of knee symptoms as well and neck and low back to warrant getting these diagnostic testing done." Insofar as her complaints of left knee pain and left thigh pain, he testified that he would defer to an orthopedist regarding whether those complaints were consistent with someone who had fallen down stairs in December 2002. Dr. Shamsnia testified that he did not get involved in the treatment of Ms. Ambrose's knees. He testified that he referred Ms. Ambrose to an orthopedist for her knee problems, but she saw Dr. Whitecloud, a physiatrist, instead. Although Ms. Ambrose scheduled a July 3, 2003 follow-up appointment, Dr. Shamsnia testified that she did not show up for that appointment. Because he only saw Ms. Ambrose on three occasions, Dr. Shamsnia testified that he did not have a prognosis for her. He testified that Ms. Ambrose was still symptomatic at the time he last saw her.
On June 16, 2003, Dr. Whitecloud first saw Ms. Ambrose. He treated her only for her knee problems. She related to him that in December 2002 she fell down a flight of stairs and that since then she had knee pain. She further related to him that she was in a subsequent automobile *541 accident in May 2003, which worsened her pain. Dr. Whitecloud characterized Ms. Ambrose as cooperative and credible and found no indication that she was faking or malingering. He reviewed the April 2003 MRIs, which were performed before her automobile accident, and found no objective sign to suggest an acute injury. Based on his examination, Dr. Whitecloud's diagnosis was patellofemoral syndrome, which he defined as "a problem where the kneecap tracks laterally, it doesn't track equally across the femoral condyles as it should, and people can get debilitating knee pain as a result." Based only on her knee problems, he recommended that she could return to work at full duty as long as she was allowed to change positions from sitting to standing as needed.
On January 9, 2004, Ms. Ambrose last saw Dr. Whitecloud. He testified that he thought her prognosis after that last visit was poor from a non-operative standpoint and that he was planning to refer her to a surgeon given her slow recovery with non-operative treatmentphysical therapy. This is the last medical treatment in the record.[20]
Ms. Ambrose, corroborated by her mother, testified that following the accident on the stairs she used the following prosthetic devices in the following order: a wheelchair, a walker, and a cane. At the time of the automobile accident, she was using a cane. As to the May 19, 2003 automobile accident, Ms. Ambrose testified that it occurred while she was en route to a doctor's visit. A truck rear-ended the vehicle she was driving while she was stopped at a red light. She described the impact as a "nice lick." In that accident, she testified that she agitated or aggravated the injuries she already had, which she described as neck and back pain. She testified that she treated for the injuries arising out of the automobile accident for about three to four months. At that point, Ms. Ambrose, corroborated by her mother, testified that she was back to where she started before the automobile accident.
At trial, Ms. Ambrose testified that she was "still hurting" and unable to function as she did before the accident on the stairs. She explained the limitations she still experiences as follows:
I like to go out. I like to dance a lot. I like to wear my high heels. I like to go shopping. That limits me. . . . I don't go to the mall anymore because it isit's very embarrassing. It's very embarrassing because I just stop and sit and take breaks because I can't stand for a long period of time. I'm not where I was before; but, you know, I'm doing better. So, it really has stopped my social life.
Ms. Ambrose's mother similarly testified that at the time of trial Ms. Ambrose still had complaints, including headaches as well as pain in her back and knees. Ms. Ambrose's mother further testified that some days when Ms. Ambrose is walking her leg gives out on her.
Given the evidence in this particular case regarding this particular plaintiff, we cannot say that the general damage award is an abuse of discretion.

EVIDENTIARY ISSUES
Ms. McLaney's final two assignments of error are evidentiary issues relating to testimony at trial regarding Ms. Ballard, Ms. McLaney's niece who rented the downstairs unit. The two issues Ms. McLaney raises are as follows:

*542 (1) Whether the district court improperly admitted testimony concerning the agency of the tenant, Ms. Ballard?
(2) Whether the trial court erred in allowing testimony of subsequent remedial measures allegedly performed by the tenant of the lower unit?
The first issue regarding whether Ms. Ballard was Ms. McLaney's agent apparently is based, as noted in Ms. McLaney's brief, on the trial court allegedly allowing Ms. Ambrose's witnesses to testify to statements detrimental to Ms. McLaney's interest made by Ms. Ballard, who was available to testify but not called as a witness.[21] The pertinent evidentiary provision is La. C.E. art. 801 D(3)(a), which defines as non-hearsay a statement offered against a party that is "a statement by an agent or employee of the party against whom it is offered, concerning a matter within the scope of his agency or employment, made during the existence of the relationship." La. C.E. art. 801 D(3)(a).
Ms. McLaney cites agency law principles in support of her argument that Ms. Ballard was not her agent and thus the evidence regarding her alleged agency was improperly admitted. However, we note, as a commentator points out, that "[a]lthough the precise extent of an agent's real or apparent authority constitutes an appropriate line of demarcation for some purposes (such as the power to contractually bind the principal), this fine distinction serves no purpose when applied to evidentiary matters." Graham C. Lilly, An Introduction to the Law of Evidence, § 57 (1978). This observation is especially fitting to the argument Ms. McLaney raises here.
In this case, the evidence presented at trial regarding Ms. Ballard's statusagent versus tenantwas conflicting. Ms. McLaney denied that Ms. Ballard was anything more than a tenant who helped her occasionally with repairs. However, in her response to an interrogatory regarding Ms. Ballard's status, she stated that Ms. Ballard "from time to time assists the McLaneys in repairing and maintaining the structure."
Ms. Ambrose, on the other hand, testified that Ms. McLaney informed them at the inception of the lease that Ms. Ballard was the manager. Ms. Ambrose further testified that she sometimes paid the rent to Ms. Ballard. She still further testified that Ms. Ballard was "Miss Fix-It" because she fixed things around the apartment and that she "did everything."
Given the conflicting testimony regarding Ms. Ballard's role, we cannot say the trial court was manifestly erroneous in making the implicit finding that Ms. Ballard was an agent of Ms. McLaney for purposes of La. C.E. art. art. 801 D(3)(a).
Turning to the second evidentiary issue, the pertinent evidentiary provision on subsequent remedial measures is La. C.E. art. 407, which provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in *543 connection with the event. This Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.
La. C.E. art. 407.
The evidence Ms. McLaney challenges is Ms. Ambrose's mother's testimony on cross-examination that on the evening of the accident she saw Ms. Ballard replace the broken board on the stair on which Ms. Ambrose fell. Ms. McLaney contends that this testimony should have been excluded under La. C.E. art. 407 because the sole purpose for this testimony was to prove liability.
The testimony at issue by Ms. Ambrose's mother was in response to a line of questions by defense counsel on cross-examination regarding if the photographs depicted the condition of the stairs on the date of the accident. Although Ms. Ambrose's mother's response regarding Ms. Ballard replacing the board could be viewed as an inadmissible reference to a subsequent remedial measure, this objection was not made at trial. Instead, defense counsel continued questioning Ms. Ambrose's mother regarding the photographs and Ms. Ballard's replacing the board. Defense counsel also called to Ms. Ambrose's mother's attention that her testimony regarding Ms. Ballard replacing the board was inconsistent with Ms. Ambrose's trial testimony that the photographs depicted the condition of the stairs on the date of the accident. The trial judge also questioned Ms. Ambrose's mother regarding when was the board replaced and whether she saw Ms. Ballard replacing the board. Given the context in which the testimony at issue was given, we do not find any evidentiary error.

DECREE
For the forgoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Although there are multiple plaintiffs, this appeal relates solely to Natalie Ambrose's personal injury claim. For ease of discussion, we refer to Natalie Ambrose as the sole plaintiff.
[2] Ms. McLaney is mistakenly referred to in the petition and the judgment as the widow of William McLaney. Ms. McLaney points out that Mr. McLaney is not deceased.
[3] At the time of the accident, Ms. Ambrose, who is five-feet three inches tall, was twenty-two years old and weighed between 175 and 200 pounds.
[4] A physiatrist is a physician specializing in physical medicine and rehabilitation. A physiatrist engages in the diagnosis and nonoperative treatment of musculoskeletal disorders.
[5] The judgment also awards the plaintiffs $1,100.00 for overpayment of rent. The parties stipulated that this amount is owed; thus, this award is not at issue.
[6] Article 2317.1 provides:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
La. C.C. art. 2322 provides:
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.
[7] Ms. McLaney acknowledges that two or three of the stairs depicted in the photographs and videotape could be found to be defective; however, she points out that those stairs did not have plywood covers on them and thus are not at issue.
[8] As Ms. Ambrose points out, her failure to pinpoint the particular step that caused her to fall is not fatal to her claim. See Turner v. Safeco Ins. Co. of America, 472 So.2d 43 (La. App. 1st Cir.1985)(holding that "such a precise showing is not required.")
[9] As discussed elsewhere in this opinion, Ms. McLaney also admitted that the handrail was loose at one time, but testified that she had it fixed around the time Ms. Ambrose moved into the unit.
[10] As the commentator further points out, the "open and obvious" defense is "a kind of implied primary assumption of the risk that remains viable after the abolition of the defense." Maraist & Galligan, supra at § 14-3. "After Murray [v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988)], courts in such cases no longer may state that the plaintiff assumed the risk, but must exonerate the defendant through a `no duty' or `no breach' formulation." Maraist & Galligan, supra at § 9-12(a).
[11] As the Supreme Court further stated, the determination of whether a condition is unreasonably dangerous requires consideration of the following factors: (1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, which includes the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature. Hutchinson, 03-1533 at pp. 9-10, 866 So.2d at 234-35.
[12] As discussed elsewhere, the jurisprudence holds that when, as in this case, a landlord leaves its tenant no way to access her upstairs unit except for defective stairs, the tenant is not negligent if she falls on the stairs.
[13] Ms. Ambrose testified that her brother had fallen down the stairs once.
[14] Articulating the reason for applying the manifest error standard to this determination, the Louisiana Supreme Court in Reed stated:

Because a determination that a defect presents an unreasonable risk of harm predominantly encompasses an abundance of factual findings, which differ greatly from case to case, followed by an application of those facts to a less-than-scientific standard, a reviewing court is in no better position to make the determination than the jury or trial court. Consequently, the findings of the jury or trial court should be afforded deference and we therefore hold that the ultimate determination of unreasonable risk of harm is subject to review under the manifest error standard.
Reed, 97,1174, p. 4, 708 So.2d at 364-65.
[15] In comparing fault, we apply the oft-cited list of factors enunciated in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):(1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) whether the capacities of the actors were superior or inferior; (5) whether any extenuating circumstances required to actor to proceed without proper thought, and (6) the relationship between the actor's conduct and the harm to the plaintiff.
[16] She listed the following other repairs: "roof work done in November of 2001. Some plastering was done in January of 2001. Wood work was done in March 2002. Garden work was done in January and April 2002. Drywall repair was done in April 2002. Exterior Painting was done in May 2002. Lighting was repaired in June 2002. Roof and rear porch were repaired in September 2002. Lighting and painting were again done in November and December 2002."
[17] Civil Code Article 1999 reads: "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La. C.C. art.1999; see also La. C.C. art. 2324.1 (providing "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury").
[18] We note that the damage award actually includes two categories of general damages: the $40,000 general damage award, which Ms. McLaney challenges, and an additional award of $5,000 for pain and suffering. We further note that Ms. McLaney lists in her assignment of errors a challenge to the award for lost wages, but does not brief that issue. We thus find that argument is not properly before us.
[19] According to Dr. Shamsnia, radiculopathy means some dysfunction or symptoms related to the specific nerve root. C7 is one of the nerves that goes to the left arm; it generally goes to the top of the forearm.
[20] There is testimony in the record by Ms. Ambrose that she lost her health insurance sometimes after her last visit with Dr. Whitecloud.
[21] Although Ms. McLaney does not cite any particular statements, our review of the record reveals that the trial court sustained one objection by defense counsel to Ms. Ambrose's testimony that Ms. Ballard was going to tell her aunt about problems with the upstairs unit. The basis for the objection, which the trial court sustained, was the lack of proof that Ms. Ballard was an agent. At a subsequent point in the trial, the trial court overruled a similar objection.